1   **WO**

2

3

4

5

6               **IN THE UNITED STATES DISTRICT COURT**

7                  **FOR THE DISTRICT OF ARIZONA**

8

9   Thomas Paul West,                    )   No. CV-98-218-TUC-DCB
                                         )
10                  Petitioner,          )   <u>DEATH PENALTY CASE</u>
                                         )
11  v.                                   )
                                         )
12                                       )   **MEMORANDUM OF DECISION**
    Dora B. Schriro, et al.,             )   **AND ORDER**
13                                       )
                   Respondents.          )
14  _____        )

15

16          Before the Court is Thomas Paul West's Third Amended Petition for Writ of Habeas

17  Corpus pursuant to 28 U.S.C. § 2254.  (Dkt. 74.)  West (hereinafter "Petitioner") alleges that

18  he is imprisoned and sentenced to death in violation of the United States Constitution.  In an

19  Order dated January 18, 2006, the Court found that the following claims were properly

20  exhausted and would be addressed on the merits: Claims A, B, E-1, F (in part), G, H, I, and

21  O-2.  (Dkt. 82.)  The parties have completed their briefing on the merits of these claims.

22  (Dkts. 106, 114, 117.)  The Court has considered the claims and concluded, for the reasons

    set forth herein, that Petitioner is not entitled to relief.

23                              **<u>BACKGROUND</u>**

24          Petitioner came to Phoenix from Illinois in June of 1987.[1]  He first stayed with his

25  friends Scott and Lisa Murray at their Glendale apartment; later he went to Tucson to stay

26

27  _____

28          [1]     This factual background is derived from the opinion of the Arizona Supreme
    Court affirming Petitioner's conviction and sentence.  *State v. West*, 176 Ariz. 432, 862 P.2d
    192 (1993)

with Polly Mailloux, another friend.  Mailloux worked at a Circle K in Tucson and was acquainted with the victim, fifty-three year old Donald Bortle.  Mr. Bortle told Mailloux's boss that he had several items for sale.  Mailloux was interested in purchasing a VCR and, on June 26, 1987, using a map that Mr. Bortle had given her boss, she and Petitioner went to Mr. Bortle's home.

Mr. Bortle had a large amount of electronic equipment for sale.  Mailloux and Petitioner spent more than an hour at his home viewing the items.  Mailloux purchased a VCR, a video camera, and a typewriter.

Two and a half weeks later, in the early morning hours of Monday, July 13, Petitioner showed up at the Murrays' apartment.  Lisa Murray answered the door and told Petitioner to come back later because Scott was sleeping.  Petitioner left and went to see Richard Wojahn, a friend whose apartment was in the same complex.  Several hours later the two left for Tucson.  Petitioner did not own a car, but he was driving a station wagon that he told Wojahn he had borrowed from friends in Tucson.

Wojahn accompanied Petitioner to Tucson where Petitioner stopped to make a phone call; after the call, according to Wojahn, Petitioner was "really upset."  He drove a few more blocks before making another phone call.  After this call, he calmed down.  Petitioner and Wojahn then drove to a secluded desert area and met Mailloux.  Petitioner spoke to her for several minutes, telling her that "he was in trouble and he was going to be out of town for a while."  Petitioner then got back in the car and drove approximately 300 to 400 yards into the desert.

Hidden beneath a tree was a cache of electronic equipment, including VCRs, videocassettes, and stereo equipment.  Wojahn helped Petitioner load many of these items into the station wagon, but they left behind several pieces that would not fit into the vehicle.  Petitioner and Wojahn then returned to Phoenix where they stored the equipment in the Murrays' apartment.

On the return trip to Phoenix, Petitioner told Wojahn that he had beaten "some guy" up and had been covered with blood.  In Phoenix, Petitioner told Scott Murray that he had

"ripped some old man off." Later, Petitioner told Scott that he wanted to "dump the car" because "it was the old man's that he had robbed." Scott and Petitioner drove separately to a remote area of west Phoenix, where Petitioner told him that "he was going to go out in the field and either just dump it or burn it." Petitioner asked Scott if he had a gas can; he did not. Petitioner then drove off in the station wagon and returned a short time later on foot. Scott saw a large cloud of smoke. Petitioner told him that he had burned the car. Subsequent investigation revealed that the car belonged to Mr. Bortle.

On Tuesday afternoon, July 14, Lisa Murray went to Wojahn's apartment, where she heard Petitioner tell Wojahn and another person that he was "trying to get rid of some merchandise." When Lisa asked Petitioner if he was in trouble, he told her "not to worry about it." Later Petitioner told Scott that "he had beat this old man up and tied his arms and legs behind his back and threw him in the closet and then he ripped his stuff off and the car." Petitioner had scratches on his hands and told Scott that "he got them beating up the old man."

The next day, while he was in her apartment, Lisa heard Petitioner say that he "had beat the fuck out of this old man and thrown him in a closet." Lisa asked Petitioner, "[Y]ou did what?" Petitioner replied, "[T]his isn't for your ears, don't worry about it."

Later, Lisa's friend Patty Amyotte called, and Lisa told her what she had heard about Petitioner's activities. Lisa went to Wojahn's apartment and confronted Petitioner. She told him that she had a "pretty good idea of what had happened" and that, if the victim could be helped, he should be. She also told Petitioner that "he should call Silent Witness or somebody that would go check to see if this man was alive and that he probably had family that loved him." Petitioner replied, "[N]o, this man had nobody," and told Lisa that she "would have to live with it."

On Thursday, July 16, Petitioner asked Scott to make plane reservations for his return to Illinois. Petitioner packed the equipment that had not been disposed of into boxes and, on Thursday night, left Phoenix with the items. In the meantime, Patty Amyotte had contacted the Pima County Sheriff's Department. Detective Petropoulos spoke to Amyotte several times during the morning of Friday, July 17, and, using the information she provided,

contacted Mailloux.  While interviewing Mailloux, the detective noticed the map to Mr. Bortle's home.  He called the number written on the map.  Receiving no response, he went to Mr. Bortle's home to investigate.

Detective Petropoulos entered the trailer and found Mr. Bortle's body in the north bedroom.  Mr. Bortle's hands and feet were tied behind his back with a vacuum cleaner cord and a lamp wire.  At trial, the medical examiner testified that Mr. Bortle had been beaten severely about the face with a blunt instrument and had probably bled to death within forty-five minutes to an hour.  Because of the body's decomposed condition, the medical examiner could only estimate that Mr. Bortle had been dead between three and seven days, placing the killing between Saturday, July 11, and Wednesday, July 15.

On the afternoon of Saturday, July 18, Sergeant Mark Wilkans of the Hodgkins, Illinois, police department stopped a vehicle for speeding.  Petitioner was one of two passengers in the car.  After arresting the driver for driving under the influence, Wilkans asked Petitioner for identification.  Petitioner had no identification but he provided Wilkans with his name and birth date.  Wilkans radioed this information to his base and was informed that Petitioner was wanted in Arizona for murder.  Wilkans arrested Petitioner.  A search of the car revealed boxes that Petitioner had brought from Arizona, which contained electronic equipment taken from Mr. Bortle.

On July 31, 1987, Petitioner was indicted on charges of first degree murder, second degree burglary, and theft.  (ROA 18.)[2]  On March 17, 1988, a jury convicted him on all counts.

---

[2]      "ROA" refers to the documents filed during Petitioner's direct appeal (Case No. CR-98-0286-AP).  "ROA-PCR" refers to the record on appeal from post-conviction proceedings prepared for Petitioner's petition for review to the Arizona Supreme Court (Case No. CR-97-0142-PC).  "ME" refers to the minute entries of the state court.  "RT" refers to the court reporter's transcript.  Original reporter's transcripts and certified copies of the appellate and post-conviction records were provided to this Court by the Arizona Supreme Court.  (*See* Dkt. 58.)

- 4 -

The trial court sentenced Petitioner to death for the murder based on three aggravating circumstances:  that Petitioner had previously been convicted of a violent crime, that the murder was committed for pecuniary gain, and that the murder was especially cruel and heinous.  (ME 8/1/88.)  On direct appeal, the Arizona Supreme Court affirmed.  *See State v. West*, 176 Ariz. 432, 862 P.2d 192 (1993).

On March 15, 1996, Petitioner filed a petition for post-conviction relief ("PCR") pursuant to Rule 32 of the Arizona Rules of Criminal Procedure.  The PCR court denied the petition without holding an evidentiary hearing.[3]  (ME 8/8/96.)  On April 23, 1998, the Arizona Supreme Court denied a petition for review.

Petitioner filed a Petition for Writ of Habeas Corpus in this Court on May 6, 1998. (Dkt. 1.)  He filed his third amended petition on October 14, 2003.  (Dkt. 74.)

## AEDPA STANDARD FOR RELIEF

Petitioner's habeas claims are governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA).  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  The AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'"  *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939-40 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)).  The AEDPA's "'highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh,* 521 U.S. at 333 n.7).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[3]      Pima County Superior Court Judge Thomas Meehan presided over Petitioner's trial and sentencing.  Judge Charles Sabados presided over the PCR proceedings.

1

2
        (2) resulted in a decision that was based on an unreasonable determination of
the facts in light of the evidence presented in the State court proceeding.

3

28 U.S.C. § 2254(d).  The phrase "adjudicated on the merits" refers to a decision resolving

4

a party's claim which is based on the substance of the claim rather than on a procedural or

5

other non-substantive ground.  *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004).  The

6

relevant state court decision is the last reasoned state decision regarding a claim.  *Barker v.*

7

*Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-

8

04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

9

        "The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule

10

of law that was clearly established at the time his state-court conviction became final."

11

*Williams v. Taylor*, 529 U.S. 362, 390 (2000).  Therefore, to assess a claim under subsection

12

(d)(1), the Court must first identify the "clearly established Federal law," if any, that governs

13

the sufficiency of the claims on habeas review.  "Clearly established" federal law consists

14

of the holdings of the Supreme Court at the time the petitioner's state court conviction

15

became final.  *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 127 S. Ct. 649, 653 (2006);

16

*Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).  Habeas relief cannot be granted if

17

the Supreme Court has not "broken sufficient legal ground" on a constitutional principle

18

advanced by a petitioner, even if lower federal courts have decided the issue.  *Williams*, 529

19

U.S. at 381; *see Musladin*, 127 S. Ct. at 654; *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir.

20

2004).  Nevertheless, while only Supreme Court authority is binding, circuit court precedent

21

may be "persuasive" in determining what law is clearly established and whether a state court

22

applied that law unreasonably.  *Clark*, 331 F.3d at 1069.

23

        The Supreme Court has provided guidance in applying each prong of § 2254(d)(1).

24

The Court has explained that a state court decision is "contrary to" the Supreme Court's

25

clearly established precedents if the decision applies a rule that contradicts the governing law

26

set forth in those precedents, thereby reaching a conclusion opposite to that reached by the

27

Supreme Court on a matter of law, or if it confronts a set of facts that is materially

28

indistinguishable from a decision of the Supreme Court but reaches a different result.

- 6 -

*Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam).  In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert*, 393 F.3d at 974.

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407.  For a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Landrigan*, 127 S. Ct. at 1939; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts.  *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*).  A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).  In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Landrigan*, 127 S. Ct. at 1939-40; *Miller-El II*, 545 U.S. at 240.  However, it is only the state court's factual findings, not its ultimate decision, that are subject to 2254(e)(1)'s presumption of correctness. *Miller-El I,* 537 U.S. at 341-42 ("The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than

1    decisions.").

2         As the Ninth Circuit has noted, application of the foregoing standards presents

3    difficulties when the state court decided the merits of a claim without providing its rationale.

4    *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160,

5    1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  In those

6    circumstances, a federal court independently reviews the record to assess whether the state

7    court decision was objectively unreasonable under controlling federal law.  *Himes*, 336 F.3d

8    at 853; *Pirtle*, 313 F.3d at 1167.  Although the record is reviewed independently, a federal

9    court nevertheless defers to the state court's ultimate decision.  *Pirtle*, 313 F.3d at 1167

10   (citing *Delgado*, 223 F.3d at 981-82); *see also Himes*, 336 F.3d at 853.  Only when a state

11   court did not decide the merits of a properly raised claim will the claim be reviewed de novo,

12   because in that circumstance "there is no state court decision on [the] issue to which to

13   accord deference."  *Pirtle*, 313 F.3d at 1167; *see also Menendez v. Terhune*, 422 F.3d 1012,

14   1025-26 (9th Cir. 2005); *Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

15                                **DISCUSSION**

16   **Claims A-1 through A-5:  Ineffective Assistance of Counsel (Guilt Stage)**

17        These claims consist of various allegations that counsel performed at a constitutionally

18   ineffective level during the guilt stage of Petitioner's trial.  As set forth below, the claims do

19   not entitle Petitioner to habeas relief.

20        Background:

21        Petitioner was represented at trial and sentencing by Frank Dawley and Maddalena

22   Fiorillo, of the Pima County Public Defender's Office.  Their defense was that the murder

23   occurred later than Sunday, July 12, at a time when Petitioner could not have been present

24   in Tucson.  In support of this defense, counsel presented witnesses, including Mr. Bortle's

25   neighbors, whose testimony suggested that Mr. Bortle was still alive after Petitioner left for

26   Phoenix, and argued that someone else, perhaps Scott Murray or Richard Wojahn, stole the

27   victim's property and murdered him.  (*See, e.g.*, RT 3/10/88 at 40-55; RT 3/15/88 at 130,

28

133, 146, 158, 167, 183; RT 3/16/88 at 57-91.)  In an attempt to bolster their alibi defense, counsel also sought to present the theory that a suicidal Mr. Bortle had arranged with others to have himself killed.  (ROA 247; *see* RT 3/9/88 at 62-84.)  However, the trial court granted the State's motion to preclude evidence that Mr. Bortle was suicidal.  (*See* RT 3/10/88 at 5-6.)

Petitioner presented his ineffective assistance of counsel (IAC) claims during the PCR proceedings.  The PCR court rejected the claims because they did "not present material issues of fact or law which would entitle the Petitioner to relief."  (ME 8/8/96 at 2.)  Because the PCR court did not provide a rationale for its rulings, this Court performs an independent review of the record to determine whether the PCR court's decisions were objectively unreasonable.  *See Himes*, 336 F.3d at 853; *Pirtle*, 313 F.3d at 1167.

<u>Clearly established federal law:</u>

For IAC claims, the applicable law is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  To prevail under *Strickland*, Petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense.  466 U.S. at 687-88.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.* at 689.  Thus, to satisfy *Strickland*'s first prong, deficient performance, Petitioner must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Id.*  For example, while trial counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary, . . . a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  *Id.* at 691.  To determine whether the investigation was reasonable, the court "must conduct an objective review of [counsel's] performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent

consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (citation and quotation marks omitted). As the Supreme Court recently reiterated: "In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made" and by applying deference to counsel's judgments. *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (quoting *Strickland*, 466 U.S. at 689).

Because an IAC claim must satisfy both prongs of *Strickland*, the reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 at 697 ("if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed"). Petitioner must affirmatively prove prejudice. *Id.* at 693. To demonstrate prejudice, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. The calculus involved in assessing prejudice "should proceed on the assumption that the decision-maker is reasonably, conscientiously, and impartially applying the standards that govern the decision." *Id.* at 695.

In determining whether Petitioner was prejudiced, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* In answering that question, a reviewing court necessarily considers the strength of the state's case. *See Allen v. Woodford*, 395 F.3d 979, 999 (9th Cir. 2005) ("even if counsel's conduct was arguably deficient, in light of the overwhelming evidence of guilt, [the petitioner] cannot establish prejudice"); *Johnson v. Baldwin*, 114 F.3d 835, 839-40 (9th Cir. 1997) (where state's case is weak, there is a greater likelihood that the outcome of the trial would have been different in the absence of deficient performance).

Also inherent in the prejudice analysis demanded by *Strickland* is the principle that in order to demonstrate that counsel failed to litigate an issue competently, Petitioner must

prove that the issue was meritorious.  *See Kimmelman v. Morrison,* 477 U.S. 365, 375 (1986).  For example, with respect to allegations that counsel was ineffective for failing to file a motion, to demonstrate prejudice a petitioner "must show that (1) had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to him."  *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) (citing *Morrison,* 477 U.S. at 373-74); *see also Boyde v. Brown*, 404 F.3d 1159, 1173-74 (9th Cir. 2005). Therefore, in evaluating a number of the following IAC claims, this Court is informed by the holding of the Arizona Supreme Court on the merits of the underlying issues.

Finally, the Court notes that under the AEDPA, its review of the state court's decision is subject to another level of deference.  *Bell v. Cone*, 535 U.S. 685, 698-99 (2002).  In order to merit habeas relief, therefore, Petitioner must make the additional showing that the state court's ruling that counsel was not ineffective constituted an unreasonable application of *Strickland*.  28 U.S.C. § 2254(d)(1).

**Claim A-1**

Petitioner contends that trial counsel failed to investigate the case adequately and pursue alternative defense strategies.  (Dkt. 106 at 35-39.)  The claim contains several complaints about counsels' representation, none of which satisfy either the deficiency or prejudice prong of *Strickland*.

Petitioner's principal contention is that counsel were ineffective because they were surprised by – and unprepared for – the State's decision to proceed only on a felony murder theory.  As the Arizona Supreme Court noted, this allegation is "belied" by the record.  *West*, 176 Ariz. at 444, 862 P.2d at 204.  Counsel presented an alibi defense.  The defense that Petitioner was not present when the murder was committed applied equally to a premeditated or felony murder theory. The defense chosen by counsel was therefore more effective than the defense Petitioner now contends should have been presented, a diminished capacity defense, which is neither admissible under Arizona law, *State v. Mott*, 187 Ariz. 536, 541, 931 P.2d 1046, 1051 (1997); *see also Clark v. Arizona*, 126 S. Ct. 2709 (2006), nor relevant

to a felony murder charge, *see State v. Nash*, 143 Ariz. 392, 400, 694 P.2d 222, 230 (1985). While discussing their alibi defense with the court and the prosecutor, counsel acknowledged that they were aware of the State's theory that Petitioner killed Mr. Bortle during a burglary. (RT 3/10/88 at 4-5.) Further demonstrating that counsel were not taken by surprise by the State's pursuit of a felony murder theory is the fact that when the jury instructions were being settled, counsel did not object to the inclusion of a felony murder instruction, arguing instead that the court should also provide a premeditated murder and lesser-included offenses instructions. (RT 3/16/88 at 11.) Petitioner has not shown that counsels' decision to pursue an alibi defense to counter the felony murder charge was unreasonable or that there was a reasonable probability of a not guilty verdict had counsel pursued a different defense.

Petitioner also alleges that counsel performed ineffectively in litigating the admissibility of a gruesome photograph and the legality of the inventory search of Petitioner's possessions. The Arizona Supreme Court having ruled that the challenged evidence was properly admitted, *West*, 176 Ariz. at 441-42, 862 P.2d at 201-02, Petitioner cannot demonstrate that he was prejudiced by counsels' performance.[4] *Kimmelman v. Morrison,* 477 U.S. at 375.

**Claim A-2**

Petitioner alleges that counsel failed to adequately investigate and present a mental health defense. (Dkt. 106 at 39-42.) He contends that the absence of a more thorough mental health evaluation caused counsel to "possibly" overlook a genetic disorder, evidence of which could have been offered to dispute Petitioner's ability to form the intent necessary to

---

[4] For the sake of completeness, the Court also notes that Petitioner has failed to show that counsels' performance in these areas was deficient. Counsel filed a motion to suppress physical evidence (ROA 144) and a motion to exclude all photos of the deceased (ROA 190). With respect to the former issue, the court held an evidentiary hearing at which defense counsel thoroughly cross-examined the Illinois officer who performed the inventory search. (RT 3/9/88.) *Compare Kimmelman v. Morrison*, 477 U.S. at 385 (failure to file suppression motion was deficient performance where failure was not based on trial strategy but due to counsel's unawareness of the illegal search and of the state's intention to introduce the evidence).

commit the underlying felony or premeditated murder. (*Id.* at 39-40.) Petitioner also claims that counsel should have bolstered his alibi defense by testing a cigarette and a knife found in the victim's trailer for fingerprints.[5] (*Id.* at 41.)

Under *Strickland*, counsels's decision to present an alibi defense is accorded a high degree of deference. *Strickland*, 466 U.S. at 689 (cautioning that "[i]t is all too tempting for a defendant to second-guess counsel's assistance after a conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission was unreasonable."). After counsel made the strategic decision to argue that Petitioner could not have been present when Mr. Bortle was killed, evidence of Petitioner's mental state became irrelevant and perhaps counterproductive. In choosing not to present such evidence, assuming it existed, counsels' performance fell squarely within the broad range of professional competence. *See Williams v. Woodford*, 384 F.3d 567, 611-12 (9th Cir. 2004) (after making "reasonable decision to present an alibi defense and not a mental-state defense," counsel "no longer had a duty to investigate a conflicting mental-state defense); *Bean v. Calderon*, 163 F.3d 1073, 1082 (9th Cir. 1998); *Correll v. Stewart*, 137 F.3d 1404, 1411 (9th Cir. 1998) (counsel's decision not to present a psychiatric defense that would have contradicted the primary defense theory of misidentification did not constitute deficient performance); *Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990); *Stewart v. Dugger*, 877 F.2d 851, 855-56 (11th Cir. 1989) (counsel not deficient for devoting resources to defense of innocence instead of defendant's mental condition). The Eleventh Circuit's characterization of counsel's performance in *Stewart* applies equally to counsels' performance on Petitioner's behalf: "counsel presented a logical and well-constructed argument inviting the jury to believe that the defendant left the victim alive and another party . . . committed the murder. This was a classic attempt to create lingering doubt in the minds of jurors as to Stewart's guilt."). 877 F.2d at 856.

Moreover, contrary to Petitioner's assertion that counsels' decision to present an alibi

---

[5]        The cigarette was a Marlboro, the brand smoked by Wojahn, Scott Murray, and, sometimes, by Petitioner. (*See* RT 3/11/88, 3/15/88 at 29-30.)

defense was made without proper investigation into other defenses, the record shows that prior to offering the alibi defense at trial, counsel arranged for Petitioner to be evaluated by two mental health experts, Dr. Daniel Overbeck and Dr. James Allender. (ROA 42, 54.) As Respondents note, there is no support in the record for the proposition that counsel unreasonably opted for an alibi defense after receiving the evaluations of Drs. Overbeck and Allender.   There is no suggestion that an insanity defense was viable, and, as noted previously, Arizona does not permit a defense of diminished capacity. *See State v. Mott*, 187 Ariz at 541, 931 P.2d at 1051 (Arizona does not allow expert testimony regarding a defendant's mental disorder short of insanity as an affirmative defense or to negate the *mens rea* element of a crime); *Clark*, 126 S. Ct. at 2732 (2006) (upholding *Mott*).

Petitioner has made no showing that counsel performed ineffectively for failing to test the cigarette and the knife for fingerprints.  Petitioner offers nothing to rebut the presumption that counsel made a strategic and informed decision not to test the items.   Similarly, Petitioner cannot show that he was prejudiced by this aspect of counsel's performance, particularly in light of trial testimony indicating that Petitioner also smoked Marlboros on occasion (RT 3/11/88 at 95) and that the knife was not used in the crimes (RT 3/15/88 at 94). Any assertion that the items contained exculpatory evidence is, on this record, pure speculation.  In addition, counsel was able to use the fact that the items were not tested to impugn the professionalism of the investigation and to insinuate that the cigarette might have been planted by another suspect. (*See* RT 3/16/88 at 71, 76.)

Because counsel did not perform deficiently or prejudice Petitioner in choosing to present an alibi defense, Petitioner is not entitled to relief on Claim A-2.

**Claim A-3**

This claim consists of five subclaims raising specific allegations of ineffective assistance with respect to counsels' handling of the jury instructions.

To satisfy *Strickland*'s prejudice prong with respect to these allegations, Petitioner must demonstrate that the allegedly erroneous instructions affected the verdict; that is, he must show that "the ailing instruction by itself so infected the entire trial that the resulting

conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)*; see Murtishaw* v. *Woodford*, 255 F.3d 926, 971 (9th Cir. 2001).  Petitioner's burden of showing prejudice is "especially heavy" because the alleged errors consisted of omitted or incomplete instructions, as opposed to misstatements of the law.  *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

On direct appeal, Petitioner challenged the jury instructions that are the subject of Claim A-3.  To the extent that the Arizona Supreme Court affirmed the propriety of those instructions, Petitioner's IAC allegations are without merit.  Failure to object to a correct instruction is neither deficient nor prejudicial and therefore does not constitute ineffective assistance.  *See Duren v. Hopper*, 161 F.3d 655, 664 (11th Cir. 1998) (failure to object to instruction that was "entirely consistent with Alabama law" did not constitute IAC); *United States v. Oplinger*, 150 F.3d 1061, 1072 (9th Cir. 1998); *United States v. Chambers*, 918 F.2d 1455, 1461 (9th Cir. 1990); *see also Boyde v. Brown*, 404 F.3d at 1173-74; *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994) ("counsel's failure to make a futile motion does not constitute ineffective assistance of counsel").

**Subclaim A-3(1):**  Petitioner alleges that counsel performed ineffectively by failing to request a jury instruction providing the definition of "intentionally" set forth in A.R.S. § 13-105(9)(a).[6]  (Dkt. 106 at 42-43.)

The Arizona Supreme Court held that the trial court's "[f]ailure to define 'intentionally,' as used in an instruction, is not fundamental error."  *West*, 176 Ariz. at 444, 862 P.2d at 204.  The court cited its decision in *State v. Barnett*, 142 Ariz. 592, 594-95, 691 P.2d 683, 685-86 (1984), which held that the "ordinary" definition of "intentionally" is "essentially the same" as the definition provided in § 13-105(9)(a) and therefore the word did not need to be defined in the jury instructions.  Petitioner does not contend that the

---

[6]      Pursuant to § 13-105(9)(a): "'Intentionally' or 'with the intent to' means, with respect to a result or to conduct described by a statute defining an offense, that a person's objective is to cause that result or to engage in that conduct."

instructions the court did provide were erroneous with respect to the elements of the offenses, nor does he specify the manner in which he was prejudiced by the omission of the statutory definition of the word intentionally.

Because it was not erroneous for the court to omit a definition of "intentionally," counsels' failure to request such an instruction did not constitute ineffective assistance.

**Subclaim A-3(2):**  Petitioner criticizes counsel for failing to object to the trial court's jury instruction on reasonable doubt. (Dkt. 106 at 43-44.)

The court provided the following instruction:

> The term reasonable doubt means doubt based upon reason. It does not mean an imaginary or possible doubt. It is a doubt which may arise in your minds after a careful and impartial consideration of all of the evidence or from the lack of evidence.

(RT 3/16/88 at 113-14.) When the court submitted the instruction to the parties, defense counsel approved it by responding, "That's fine."  (*Id.* at 7.)  The Arizona Supreme Court found the instruction was not fundamental error and refused to consider the claim on the merits. *West*, 176 Ariz. at 444, 862 P.2d at 204.

In support of his claim that the instruction was objectionable, Petitioner asserts that the United States Supreme Court, in *Cage v. Louisiana*, 498 U.S. 39 (1990), considered "a similar jury instruction on reasonable doubt" and rejected it on due process grounds. (Dkt. 106 at 43-44.) Petitioner is incorrect.  In *Cage*, the challenged instruction defined reasonable doubt as "such doubt as would give rise to a grave uncertainty" and an "actual substantial doubt." 498 U.S. at 40. The Court explained that such phrases "suggest a higher degree of doubt than is required for acquittal under the reasonable-doubt standard."  *Id.* at 41. Therefore, the instruction in *Cage* permitted a reasonable juror to find the defendant guilty based on a lesser degree of proof than that required by the Due Process Clause.  *Id.*  By contrast, the instruction given in Petitioner's trial did not contain language that would enable a juror to misconstrue the nature of "reasonable doubt" and apply a lesser burden of proof.

Because the reasonable doubt instruction was proper, counsel did not perform deficiently by failing to object to its use and Petitioner is not entitled to relief on this claim.

*Subclaim A-3(3):*  Petitioner contends that counsel performed ineffectively by failing to request an instruction on the general unreliability of informants' testimony because three "suspicious" individuals testified at trial.  (Dkt. 106 at 44-45.)  This claim is meritless.

The Arizona Supreme Court rejected Petitioner's argument that such an instruction was required, explaining that, under Arizona law, "instructing the jury to consider the testimony of an interested witness with skepticism is an impermissible comment on the evidence."  *West*, 176 Ariz. at 444-45, 862 P.2d at 204-05.  Because the instruction was not available under state law, counsel did not perform deficiently by failing to request it.

In addition, the trial court provided an appropriate instruction regarding factors the jury should consider in evaluating a witness's testimony:

> You must decide the accuracy of each witness's testimony. Take into account such things as his or her ability and opportunity to observe, his or her memory, his or her manner while testifying, any motive or prejudices he or she might have, any inconsistent statements he or she might have made.

> Consider the testimony in light of all of the evidence in the case.

(RT at 3/16/88 at 111.)

Finally, Petitioner asks this Court to "transfer" the holding in *Aguilar v. Texas*, 378 U.S. 108, 115-16 (1964), under which a search warrant application must be supported by a "credible" or "reliable" information, to require a jury instruction on the "presumption of unreliability" for an informant's trial testimony.  (Dkt. 106 at 45.)  The request to extend Supreme Court precedent is itself an indication that Petitioner's claim is not supported by clearly established federal law and, therefore, no basis exists for habeas relief under the AEDPA.

*Subclaim A-3(4):*  Petitioner contends that counsel performed ineffectively by failing to request a "proper" felony murder instruction.  (*Id.* at 45-46.)  While he concedes that the trial court's felony murder instruction accurately reflected the applicable statutes, Petitioner faults counsel for failing to request a definition of the phrase "in furtherance of."  (*Id.*)

The Arizona Supreme Court considered and rejected the underlying claim:

> Defendant contends that the trial court committed fundamental error in failing to define "in furtherance of" as that term is used in Arizona's felony

- 17 -

1
2
3
4
5

> murder statute. That term, in the context of felony murder, is defined in Arizona case law to mean "death result[ing] 'from an action taken to facilitate the accomplishment of [the felony].'" "In furtherance of" is a common term. Assuming, however, that the term should have been defined, the failure to do so certainly is not fundamental error under the facts of this case. Consistent with defendant's boasts to his friends in Phoenix that he had "beaten the fuck out of some old man" and tied him up while burglarizing his house, the victim was found bound and bludgeoned. No evidence suggests that the death was not "in furtherance of" the burglary. Therefore, we find no fundamental error.

6

*West*, 176 Ariz. at 445, 862 P.2d at 205 (citations omitted).

7
8
9

Again, because the instruction as given was not erroneous, and because Petitioner has failed to demonstrate that he was prejudiced by the omission of the statutory definition of a commonly understood phrase, his IAC claim is without merit.

10
11
12
13
14
15

***Subclaim A-3(5):***  Petitioner alleges that counsel did not "zealously" support their request for instructions on lesser included offenses. (Dkt. 106 at 46-49.)  As Petitioner acknowledges, counsel did request the court to instruct the jury on premeditated murder and the lesser included offenses of second degree murder, manslaughter, and negligent homicide. (RT 3/16/88 at 9-15.) The trial court declined to provide the instructions after the State elected to pursue only a felony murder theory.  (*Id.* at 12.)

16
17
18
19
20

On direct appeal, the Arizona Supreme Court rejected the claim that the trial court should have instructed the jury on premeditated murder "because there is no obligation to instruct the jury on theories withdrawn in the prosecutor's discretion." *West*, 176 Ariz. at 443, 862 P.2d at 203.  The court also rejected the claim that *Beck v. Alabama*, 447 U.S. 625 (1980), required submission of premeditated and lesser included homicide offenses:

21
22
23

> In *Beck*, the [United States Supreme] Court stated only that, in a capital case, due process entitles the defendant to instructions on any existing lesser included offenses to the crime charged that are factually supported by the evidence. Even assuming the factual applicability of lesser included offenses in this case if premeditation had gone to the jury, *Beck* does not require the court to give instructions on crimes or theories no longer in issue.

24
25

*West*, 176 Ariz. at 443, 862 P.2d at 203.  This ruling is not an unreasonable application of clearly established federal law.

26
27

*Beck* requires that where a lesser included offense exists for the charged crime, and where there is evidence to support a verdict on the lesser offense, the failure to permit a jury

28

instruction is unconstitutional.  447 U.S. at 638.  Under Arizona law, there are no lesser included offenses of felony murder.  *See, e.g.*, *State v. Dickens*, 187 Ariz. 1, 23, 926 P.2d 468, 490 (1996).  Thus, the trial court was not required to instruct the jury on those separate offenses.  *Hopkins v. Reeves*, 524 U.S. 88, 96-97 (1998) (Nebraska was not constitutionally required to give an instruction on the non-capital charge of second degree murder when the defendant was charged with the capital count of felony murder because, under Nebraska law, second degree murder was not a lesser included offense of felony murder).  *Beck* does not require the trial court to create lesser included offenses to a capital crime merely so that the jury may consider a noncapital alternative where no such alternative exists under state law. *Id.* at 97.

Moreover, Petitioner's jury was instructed as to two noncapital offenses: burglary and theft.  The jury was thus not presented with an "all or nothing" choice either to convict Petitioner of a capital offense or to acquit him altogether.  *See Schad v. Arizona*, 501 U.S. 624, 646 (1991).

Because Petitioner was not entitled to a lesser included offense instruction, even if counsel had failed to advocate for the inclusion of such instructions their performance would not have been ineffective.  Petitioner is not entitled to relief on this claim.

### Claim A-4

Petitioner alleges that counsel "either gave up or merely lost their desire" to represent him. (Dkt. 106 at 49.) The claim simply repackages, under the label "lack of zealous representation," other specific allegations of IAC and argues that they are not governed by *Strickland* but by the presumed-prejudice standard set forth in *United States v. Cronic*, 466 U.S. 648 (1984).  In *Cronic*, the Supreme Court carved out a narrow exception from the *Strickland* standard.  This standard of per se prejudice applies in three situations: where counsel has been denied; where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," thus causing "a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable"; or where counsel is asked to render assistance in circumstances where it was impossible for competent counsel to do so.

*Id.* at 659-62; *see Bell v. Cone*, 535 U.S. at 695-96.

Petitioner mistakenly contends that the second circumstance applies to counsels' performance. Counsel did not abandon Petitioner or "entirely fail" to subject the State's case to adversarial testing. In fact, as Respondents detail (Dkt. 114 at 39), counsel zealously defended Petitioner throughout the pretrial proceedings, during trial, and at sentencing. *Cronic*, by contrast, is "reserved for situations in which counsel has entirely failed to function as the client's advocate." *Cf. Florida v. Nixon*, 543 U.S. 175, 189 (2004) (*Cronic* standard not applicable where counsel conceded defendant's guilt without defendant's express consent because that decision can be strategic and reasonable). Accepting Petitioner's individual IAC allegations as true, they represent isolated incidents rather than a complete abandonment of adversarial testing.[7] *See Bell v. Cone*, 535 U.S. at 695-96; *United States v. Thomas*, 417 F.3d 1053, 1057 (9th Cir. 2005). Because *Cronic* does not apply to these IAC allegations, Claim A-4 is without merit and will be denied.

**Claim A-5**

Petitioner alleges that Mr. Dawley and Ms. Fiorillo performed deficiently because they lacked experience in capital cases and because their caseload was too high and they lacked adequate funding. (Dkt. 106 at 51-53.) Petitioner offers no factual or analytical support for either of the latter assertions, and the premise equating inexperience with ineffectiveness is faulty.[8] Indeed, the premise was disposed of in *Cronic*, where the Supreme

---

[7]       This claim is not bolstered by the one incident cited by Petitioner to support his assertion that counsel abandoned him – i.e., counsels' failure to move for acquittal under Rule 20. (Dkt. 106 at 50.) At the close of the State's case, Mr. Dawley informed the court that "quite frankly I don't think there's a valid rule 20 motion to make." (RT 3/15/88 at 131.) Counsel's performance is not considered ineffective when he fails to make motions that he reasonably believes to be meritless. *Lowry v. Lewis,* 21 F.3d 344, 346 (9th Cir. 1994).

[8]       Petitioner concedes that Mr. Dawley was an experienced criminal attorney. (Dkt. 106 at 51.) Respondents indicate that Mr. Dawley had served as a prosecutor in Yuma County for eight years prior to joining the Pima County Public Defender's Office in 1986. (Dkt. 114 at 41 n.6.) Petitioner states that neither Mr. Dawley nor Ms. Fiorillo had previously tried a capital case. (Dkt. 106 at 51.)

Court explained that "[t]he character of a particular lawyer's experience may shed light in an evaluation of his actual performance, but it does not justify a presumption of ineffectiveness in the absence of such an evaluation."  466 U.S. at 665; s*ee Pizzuto v. Arave*, 280 F.3d 949, 974 (9th Cir. 2002) ("'an ineffective assistance claim cannot be based solely on counsel inexperience' in capital cases") (quoting *Ortiz v. Stewart*, 149 F.3d 923, 933 (9th Cir. 1998) ("no support in law" for IAC claim based on lack of experience); *LaGrand v. Stewart*, 133 F.3d 1253, 1275 (9th Cir. 1998) ("It is not the experience of the attorney that is evaluated, but rather, his performance.").

Petitioner was represented by two attorneys, at least one of whom was an experienced criminal lawyer.  He has presented no information indicating that counsels' lack of capital experience had any bearing on their performance.  Therefore, Petitioner is not entitled to relief on Claim A-5.

**Claims A-6 through A-8:  Ineffective Assistance of Counsel (Sentencing Stage)**

These claims consist of various allegations that counsel performed ineffectively during the sentencing stage of trial.  As set forth below, the allegations do not entitle Petitioner to habeas relief.

**Claim A-6**

Petitioner contends that counsel were ineffective because they failed to present mitigating evidence at the initial sentencing hearing.  (Dkt. 106 at 53-56.)  This claim is without merit because, as discussed below, the sentencing hearing was continued and at the subsequent hearing counsel presented substantial mitigating information.   Therefore, Petitioner suffered no prejudice from counsels' performance at the initial hearing.

**Claim A-7**

Petitioner alleges that counsel were ineffective for stipulating to the existence of his prior manslaughter conviction to support the aggravating circumstance A.R.S. § 13-

703(F)(2), a prior conviction for a violent felony.[9]  (Dkt. 106 at 56-57.)

Petitioner was convicted of voluntary manslaughter in Illinois in 1981 after he shot a man to death during a confrontation at a party.  (*See, e.g.*, RT 8/1/88 at 49-62, 64-72, 106.) At the initial sentencing hearing in the present matter, defense counsel stated: "We are agreeable to stipulating that Mr. West has suffered a prior manslaughter conviction which satisfies the aggravation, the aggravating circumstance described in 13-703 which is that it was a crime involving violence I think is the language."  (RT 5/4/88 at 2.)

The Arizona Supreme Court upheld the validity of the stipulation:

> The defendant complains, however, that he did not personally participate in the stipulation. "It is well established that a defendant may be bound by his counsel's trial strategy decision to waive even constitutional rights." . . . We do not believe a stipulation to facts that the state could easily have proved amounts to an exceptional circumstance requiring defendant's consent.  The stipulation is binding until and unless it is withdrawn.

*West*, 176 Ariz. at 447, 862 P.2d at 207 (citation omitted).

The court further noted that an Illinois appellate court opinion issued after the sentencing proceedings confirmed Petitioner's voluntary manslaughter conviction as "a crime included under § 13-703(F)(2)." *Id.*  Finally, the court observed that "Defendant may have had good reasons for concentrating his sentencing hearing on issues other than his prior conviction." *Id.*

Petitioner is not entitled to relief on this claim because he was not prejudiced by counsels' performance.  As the Arizona Supreme Court explained, the prior conviction existed and if there had been no stipulation the State would have produced the appropriate documentation. *Id.* at 447, 862 P.2d at 207 ("state could easily have proved" the fact of the prior conviction and it was "not surprising" that the state did not produce a certified copy of the conviction given the stipulation).  Further, the Arizona Supreme Court held that

---

[9]     At the time of Petitioner's sentencing, A.R.S. § 13-703(F)(2) provided that the sentencing court must consider it an aggravating circumstance if "[t]he defendant was previously convicted of a felony in the United States involving the use or threat of violence on another person."  Arizona courts define "violence" as the "exertion of any physical force so as to injure or abuse."  *State v. Arnett*, 119 Ariz. 38, 51, 579 P.2d 542, 555 (1978).

Petitioner's voluntary manslaughter conviction satisfied (F)(2).  *Id.*

Petitioner argues that the stipulation prevented counsel from arguing that the underlying facts of the prior crime prevented it from meeting the definition of a crime of violence.  This argument is legally and factually incorrect.  The circumstances surrounding a prior conviction do not determine its status as an aggravating factor under § 13-703(F)(2); rather, the court must look only to the statutory definition of the previous offense.  *See, e.g.*, *State v. Gillies*, 135 Ariz. 500, 511, 662 P.2d 1007, 1018 (1983).  As discussed below, notwithstanding the stipulation, counsel presented extensive testimony at the sentencing hearing in support of Petitioner's assertion that the 1981 shooting was an act of self-defense.[10]

In *Hooker v. Mullin*, 293 F.3d 1232, 1246 (10th Cir. 2002), the Tenth Circuit rejected a similar IAC claim.  Counsel stipulated to several aggravating factors, including convictions for prior violent felonies (manslaughter, assault, and battery).  *Id.*  The Court of Appeals found that this was a reasonable strategy even though there was potentially mitigating information to the effect that the shootings were accidental.  *Id.*  The court also noted that the jury would have found those aggravating circumstances regardless of the stipulations.  *Id.*  In Petitioner's case, counsel lost nothing by stipulating to the prior conviction and were subsequently able to present favorable evidence regarding the circumstances of the crime.

---

[10]      At the close of the sentencing hearing, counsel explained his strategy in presenting evidence concerning the circumstances of the 1981 incident:

> I'm not saying it's not an aggravating circumstance, by definition I think you have to accept the conviction.  What I am saying is that the background of that and the possibility that Tom didn't get a full hearing on that prior are mitigating circumstances which offset that and that's the position I am trying to take, I can't ask Your Honor to personally overturn the conviction but I think in weighing that prior conviction that the factors we presented are something you can consider in deciding how much weight it should be given.

(RT 8/1/88 at 124-25.)

Finally, there was no prejudice from counsels' decision to stipulate to the manslaughter conviction because two other aggravators were present. Having independently reviewed the record, including all of the aggravating and mitigating circumstances, the Arizona Supreme Court explained that "we believe this to be an appropriate death penalty case even if it be assumed that the Illinois voluntary manslaughter conviction was not properly proved." *West*, 176 Ariz. at 452 n.4, 862 P.2d at 212 n.4.

**Claim A-8**

Petitioner alleges that counsel performed ineffectively at sentencing by failing to investigate and present mitigation evidence of his impaired mental health, head injuries, childhood abuse, immaturity, substance abuse, and failed efforts at drug rehabilitation. (Dkt. 106 at 57-63.)

Background:

Petitioner was convicted on March 17, 1988. On May 2, counsel filed their initial sentencing memorandum arguing that the death penalty was an inappropriate sentence for a felony murder conviction where there had been "no finding that the accused planned or intended death." (ROA 420.) At the initial sentencing hearing, on May 4, 1988, counsel again indicated that as "a matter of strategy" they intended to rely on the legal argument "that the death penalty does not apply to this case," rather than presenting mitigation witnesses. (RT 5/4/88 at 5-6.) Counsel denied that this decision implied that there was no mitigation information to present. (*Id.* at 5.) In fact, counsel had sought and obtained mental health experts to evaluate Petitioner, but determined that their conclusions were insufficiently helpful to warrant calling them as witnesses. (*Id.* at 7.)

At the initial hearing, the trial court indicated that it would reject counsels' legal argument regarding felony murder "as a matter of fact and as a matter of law in this case" and allowed Petitioner an opportunity to comment. (*Id.* at 8.) Petitioner stated that a lot of people could testify on his behalf, but he did not "feel like dragging them into this" because he thought the court had already made up its mind and would expect Petitioner's friends to support him. (*Id.* at 9.) The court disagreed and assured Petitioner that it would "consider

anything that was put on this witness stand in mitigation of your case." (*Id.*)  After Petitioner and his counsel conferred privately, the court granted counsels' request for a continuance of the sentencing hearing to June 6, 1988. (*Id.*)

On May 11, 1988, counsel again moved to continue the hearing so that they could "further explore the following areas of potential mitigation," consisting of Petitioner's "psychiatric history," including possible "organic brain damage" due to drug abuse or "physical trauma suffered in various accidents"; his drug and alcohol abuse; and his prison and jail records, as potentially relevant to the "'model prisoner' mitigating circumstance." (ROA 455-56.)  In a hearing on the motion to continue, counsel explained that they had reevaluated their previous position and had decided to "explore all the possibilities":

> [W]hat I intend to do with that time is send an investigator back to Tom's hometown in Illinois to look into his background, see if there's anything there, do any further evaluation in the way of mental health and drug addiction and present those to you as possible mitigating factors.

(RT 5/23/88 at 2.) The trial court granted the continuance, setting the sentencing hearing for August 1, 1988, and explaining that it wanted to "give [Petitioner] every opportunity to present what he can." (RT 5/23/88 at 3.)

Thereafter, counsel sought and received a court order to obtain Petitioner's psychiatric and medical records from the Pima County jail.  (RT 5/31/88 at 2-5.)  Counsel also retained the services of Terry Hickey, a substance abuse expert.  (ROA 491.)  Counsel sent an investigator to Kankakee, Illinois, to obtain information about Petitioner's family background and the circumstances surrounding the 1981 incident.

On July 26, 1988, counsel filed a supplemental sentencing memorandum emphasizing the mitigating information they had developed.  (ROA 476-80.)  They also filed a motion arguing that Arizona's death penalty scheme was unconstitutional (ROA 488) and a supplemental memorandum on proportionality and the pecuniary gain aggravating factor (ROA 496).

Prior to the sentencing hearing, counsel filed numerous exhibits for the court's review, including transcripts of witness interviews, a newspaper article on Petitioner's Illinois

manslaughter conviction, and hospital records.  (*See* Dkt. 114, Exs. A-U; RT 8/1/88 at 10.)

The court subsequently confirmed that it had "read everything" proffered by the defense.

(RT 8/1/88 at 4, 141.)

At the sentencing hearing, counsel called several witnesses.  The first was Terry

Hickey, the chemical dependency therapist, who testified in detail about Petitioner's mental

condition, particularly as it was affected by his substance abuse and family background.

Prior to his testimony, Hickey reviewed "a voluminous collection of materials,"

including transcripts of interviews the defense investigator conducted with Petitioner's

family members and friends, Petitioner's prison records from Illinois, a medical chart from

a detox program, and a neuropsychological evaluation.  (RT 8/1/86 at 7-8.)  He also

interviewed Petitioner and Petitioner's mother, brother, and ex-girlfriend.  (*Id.*)  Based upon

this information, Hickey diagnosed Petitioner with chemical dependency.  He summarized

this finding as follows:

> I think it's long standing, it started when he was 10 years of age.  He was introduced by his brother.  There was a lot of alcohol use by his father in the family.
>
> And he began using it, it interfered with his life to such an extent he didn't complete school and he continued using it, at one time or another he used every drug that was available to him.  I would say alcohol all along has been one of the predominant drugs that caused his problems.  He has continued to use whenever he has had the opportunity to do so.  In spite of adverse consequences.

(*Id.* at 8-9.)

Hickey discussed then Petitioner's medical records, which included reports from an

incident in June 1987, when he was diagnosed with alcohol withdrawal and alcohol and

cocaine dependency. (*Id.* at 10, 18-19.)  Although Hickey could not be certain that Petitioner

was under the influence of drugs when the murder occurred, Petitioner had used cocaine both

prior to and after the time of the crime. (*Id.* at 10-11)

Next, Hickey explained that Petitioner's drug use affected his judgment and ability

to make reasonable choices: "Anyone that uses the amount of drugs that I have occasion to

believe that he was using would have their judgment impaired."  (*Id.* at 11.)  Hickey

- 26 -

described the nature of the impairment caused by drug abuse, particularly the use of cocaine, which "is one of the drugs that coerces people the most in terms of a drive to secure it." (*Id.* at 13.)  He explained that the disease of addiction is "almost like cognitive impairment, it looks a little bit like what you see with right hemisphere head injuries, people think they're doing all right, they believe they're doing all right in spite of what other people are telling them." (*Id.* at 15.)  For such individuals, procuring drugs becomes their main focus and leads to the destruction of their "moral fabric." (*Id.* at 14.)  Hickey also explained that cocaine use is associated with violence. (*Id.* at 45.)  He indicated that Petitioner had gone through detox programs but had never completed treatment for his addictions. (*Id.* at 16.)

While discussing the effects of drug abuse, counsel asked Hickey, "even if we assume that, that these people can know what they are doing is wrong, is it also a symptom or a function of their disease that they are unable to totally control their behavior so as to obey the laws?" (*Id.* at 20.)  Hickey responded:

> Because of the process that they have gone through, when they find themselves at those kind of choices, they don't use the same kind of reasoning because when you are really deep into it, you can still control your behavior but it doesn't seem, the choices don't seem as crazy as they were when you were first presented with them.  That's the kind of craziness if you will of the disease process.  But they can still appreciate that.

(*Id.*)

Hickey proceeded to explain the impact of Petitioner's dysfunctional family background on his psychological condition.  He explained that members of Petitioner's family were also chemically dependent; the family was headed by Petitioner's alcoholic father, and Petitioner's older brother, James, also became an addict. (*Id.* at 21, 25.)  Hickey spoke extensively with Petitioner and obtained corroborating information from Petitioner's mother and brother. (*Id.* at 22.)  These interviews focused on Petitioner's experiences during the formative years of ages five through nine. (*Id.*)  During the interviews Petitioner eventually opened up and, as relayed by Hickey, described the violence he had witnessed.  For example, Hickey testified that Petitioner "saw, at one point on one occasion he recalls, and this was corroborated by other family members, dad had been hitting mom with a

bowling pin.  At that particular time his brother who was about 12 or 13 years old at the time pulled a shotgun on dad to stop dad from hitting mom."  (*Id.* at 23-24.)  Hickey described physical abuse against the mother and the children, including an incident in which Mr. West broke James's nose when James was fourteen.  (*Id.* at 29.)

According to Hickey, "The father's way of dealing with his sons was to withdraw affection.  There were times when he would not refer to them by name.  For months at a time he would call them pothead number one and pothead number two.  And when there were problems he would either be physically abusive or he would withdraw affection."  (*Id.* at 26.) Hickey reiterated that there was "an extreme amount of emotional abuse, the common form of addressing the kids in the family was fucking pothead.  They were continuously belittled, constantly berated."  (*Id.* at 29.)   The boys witnessed the same kind of emotional abuse directed against their mother.  (*Id.*)

The boys could not trust or rely on their father, who would experience alcoholic blackouts and forget promises he had made while drinking.  (*Id.* at 26-27.)  The family was isolated and did not "function the way families ought to function because of that chemical dependency, they are an extremely disfunctional [sic] family."  (*Id.* at 28.)  Meanwhile, Mrs. West was engaged in minimization and denial of the family's problems.  (*Id.* at 25-26.) According to Hickey, when she was a child, Mrs. West had been exposed to extreme physical violence perpetrated by her stepfather against her mother.  (*Id.* at 24-25.)

Hickey explained that Petitioner's substance abuse problems were caused by both genetic and environmental factors.  (*Id.* at 30-31.)  Petitioner was prone to follow the family model of chemical dependency and violence.  (*Id.*)  Hickey detailed the dynamics of a family led by an alcoholic father and a co-dependent mother, wherein the first-born child is the "hero" while the second-born (Petitioner) is typically the "scapegoat."  (*Id.* at 32-34.) According to Hickey, "it cannot be minimized the kind of effect that chemical dependency has on family systems."  (*Id.* at 35.)

Hickey concluded by recommending that Petitioner and his entire family receive treatment.  (*Id.* at 46.)  When asked by counsel to explain Petitioner's inability to take

advantage of past treatment opportunities, Hickey explained that it was not unusual for individuals with Petitioner's level of addiction to fail at their first attempts. (*Id.* at 47.)

Following Hickey's testimony, counsel called friends and family members who were familiar with Petitioner's background. The first of these witnesses was Luann St. Aubin, who was Petitioner's girlfriend at the time of the 1981 shooting. (*Id.* at 51.) St. Aubin testified that Petitioner treated her well, but acknowledged that he used drugs during their relationship. (*Id.* at 60.) She described the victim of the 1981 shooting, Billy Oldhum, as a physically large man, a drug dealer and trouble-maker who behaved aggressively at the party before he was shot. (*Id.* at 53.) At the time of the party, St. Aubin believed she was pregnant with Petitioner's child. (*Id.* at 58.) During the party, she got into a fight with another girl in the bathroom and Oldhum started kicking her in the back and pulling her hair. (*Id.* at 54.) Petitioner tried to break up the fight but couldn't get into the bathroom; he went to the closet to get his gun and then returned. (*Id.* at 55-57.) He pointed the gun at Oldhum and told him to let St. Aubin get up and to leave. (*Id.* at 56.) Oldhum said that Petitioner didn't have the balls to pull the trigger; then he reached for his own gun, which, according to St. Aubin, both she and Petitioner had seen earlier that night. (*Id.* at 57-58.) At that point Petitioner shot him. (*Id.* at 57.)

Although she was a witness at Petitioner's Illinois trial, St. Aubin did not offer this self-defense testimony because, she stated, Petitioner's counsel never asked her about it. (*Id.* at 59.) She also testified that she and her family received threats, possibly from parties associated with Oldhum. (*Id.*)

The next witness at the sentencing hearing was Michael Richmond, who was also present at the 1981 party. (*Id.* at 64.) Richmond testified that Oldhum was a drug dealer and bully who had behaved abusively at the party and held St. Aubin's hair while the other girl was hitting her during the fight in the bathroom. (*Id.* at 65). According to Richmond, Oldhum was "raising up" when Petitioner shot him. (*Id.* at 68.) Although he did not see Oldhum with a gun that night, Richmond knew that Oldhum carried a gun. (*Id.* at 69-70.) Richmond also stated that he did not testify fully at Petitioner's Illinois trial because he had

been threatened by Oldhum's friends.  (*Id.* at 71.)

Norma Millsap, a friend of Petitioner's mother and the West family in Illinois, testified next.  (*Id.* at 73.)  She also described incidents of witness intimidation at Petitioner's previous trial. (*Id.* at 74-75.)

Millsap described the West family as dysfunctional; the mother was immature and the father was an alcoholic.  (*Id.* at 79-80).  Mr. West was mean, "the most abusive man I have ever heard."  (*Id.* at 80).  According to Millsap, Mr. West never called the children by their names, and subjected them to constant abuse.  (*Id.* at 81.)  "He would put them down about anything" (*id.* at 83) and referred to them as "pothead number one and pothead number two" (*id.* at 85).  Millsap testified that the West boys were "on the street very young" or were sent to stay with a friend in the summers.  (*Id.* at 84.)  Mrs. West would hide money for the boys with Millsap because their father did not want anybody helping them out.  (*Id.* at 84-85.)  Mr. West would not accept phone calls from them.  (*Id.* at 85.)  Mr. West was also abusive toward his wife.  (*Id.* at 82.)

Millsap also testified about Petitioner's drug abuse, indicating that Petitioner began using marijuana at age eleven or twelve.  (*Id.* at 75.)  According to Millsap, Petitioner was in the hospital right before he left for Arizona, where he planned to get clean and turn his life around. (*Id.* at 75-76.)  The hospital recommended that he enter a drug treatment program.  (*Id.* at 78.)  The nurses there described him as polite and nice.  (*Id.*)  Finally, Millsap described Petitioner's love for his daughter and his desire to make her proud. (*Id.* at 83.)

Brenda Johnson, Petitioner's ex-wife and the mother of his daughter, testified next.  (*Id.* at 86.)  She indicated that she was now employed at a halfway house where she performed drug counseling.  (*Id.* at 88-89.)  She and Petitioner married when he was nineteen and she was sixteen.  (*Id.* at 87.)  During their relationship, she observed Petitioner abuse alcohol, speed, pot, acid, and PCP.  (*Id.* at 89.)  Johnson testified that she lived with the West family for a period.  (*Id.*)  According to Johnson, Petitioner's father was an alcoholic and was "emotionally abusive.  He never thought anyone could meet his standards, he never thought that you were good enough" (*id.* at 90).

The final witness on Petitioner's behalf was his older brother, James. He described their father as verbally and physically abusive toward their mother. (*Id.* at 92-93.) James broke up fights between his parents. (*Id.* at 93.) Mr. West broke James's nose when James got a part-time job. (*Id.*) James ran away from home at fourteen; later he was thrown out of the house. (*Id.* at 94.) James testified that Petitioner began using drugs at age eleven. (*Id.* at 95.) He testified that their parents were aware of his and Petitioner's drug problems but did nothing to help. (*Id.* at 100-01.)

James testified that he was close to Petitioner – "closer than your average brothers" – because of what they had experienced growing up. (*Id.* at 97.) He also discussed Petitioner's positive characteristics, describing Petitioner as easy to get along with and "brighter and capable of more work than I was." (*Id.*) James testified that Petitioner and Petitioner's daughter loved each other very much. (*Id.* at 99.) He also stated that Petitioner was "great" with James's kids. (*Id.*)

At the conclusion of the testimony, Petitioner made a statement to the court. He called his counsel "good attorneys" but complained that their large case load delayed their timely examination of the crime scene; he also faulted the court for precluding "the [suicide] defense" and claimed that he could prove he was not at the crime scene because he was in another city and that "the person that [he] was with was never even sought." (*Id.* at 104.) When the court asked Petitioner if he had shared the latter information with his attorneys, he acknowledged that he had "mentioned" it to them and that they had turned the matter over to investigators, but that his lawyers thought it was strange that Petitioner "didn't know the person's name." (*Id.* at 104-05.) Although Petitioner expressed remorse for Mr. Bortle's death, he continued to deny any involvement in the crime. (*Id.* at 110.) When Petitioner completed his statement, defense counsel asked that the court consider the remarks from "a frustrated Tom West" as "a product of the environment we told you about." (*Id.* at 121.)

At the conclusion of the hearing, counsel argued that the court should consider as mitigation Petitioner's substance abuse, abusive childhood, and the factors introduced to "mitigate" his prior conviction. (*Id.* at 124-25.) Counsel also argued that a review of similar

cases showed that the death penalty was too severe a punishment for Petitioner. (*Id.* at 126-27.)   Finally, counsel called for the court to show "compassion" and "mercy," citing Petitioner's positive characteristics, including his honesty, lack of vindictiveness, gentle nature, artistic and mechanical skills, good relationship with the jail guards, and sense of humor. (*Id.* at 128-29.)   Counsel argued that Petitioner had gained insight into his own problems and the difficulties he had caused for his ex-wife and young daughter, and that he wanted to be rehabilitated. (*Id.* at 129.)

In sentencing Petitioner, the trial court found that Petitioner had proven two nonstatutory mitigating circumstances, that Petitioner had "experienced an emotionally deprived childhood" and that he had "a substance abuse problem." (RT 8/1/88 at 141; ME 8/1/88 at 2.)   The court found that the mitigating circumstances did not outweigh the aggravators and imposed a sentence of death. (*Id.* at 142; ME 8/1/88 at 2.)

Analysis:

The right to effective assistance of counsel applies not just to the guilt phase, but "with equal force at the penalty phase of a bifurcated capital trial." *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Clabourne v. Lewis*, 64 F.3d, 1373, 1378 (9th Cir. 1995)).   With respect to prejudice at sentencing, the *Strickland* Court explained that "[w]hen a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  466 U.S. at 695.   In *Wiggins*, the Court further noted that "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."  539 U.S. at 534.   The "totality of the available evidence" includes "both that adduced at trial, and the evidence adduced in the habeas proceeding." *Id.* at 536 (quoting *Williams*, 529 U.S. at 397-98).

Petitioner alleges that counsel failed in their presentation of various categories of mitigating evidence, including Petitioner's impaired mental health, head injuries, childhood abuse, substance abuse, immaturity, and failure to complete drug rehabilitation. This claim is without merit because Petitioner has failed to demonstrate (1) that counsel were deficient

in their presentation of information concerning Petitioner's mental health, difficult childhood, or substance abuse problems and (2) that counsels' performance was either deficient or prejudicial with respect to the remaining issues, including Petitioner's alleged head injuries.

Counsel adequately investigated and presented to the trial court evidence of Petitioner's background, including his upbringing in a dysfunctional family and his severe, long-standing difficulties with drug and alcohol abuse. Petitioner has not set forth any additional information concerning these topics that counsel should have discovered and offered at sentencing.

In contrast to the performance of counsel in the recent Supreme Court cases cited by Petitioner – *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins*, 539 U.S. 510; and *Williams*, 529 U.S. 362 – his counsel offered graphic and compelling testimony by both expert and lay witnesses describing Petitioner's unfortunate childhood. This evidence of Petitioner's "troubled history" is the kind of information the Supreme Court has "declared relevant to assessing a defendant's moral culpability." *Wiggins*, 539 U.S. at 535. Here, counsel presented a detailed picture of Petitioner's background. Counsels' presentation was sufficiently persuasive to convince the trial court that Petitioner's deprived childhood was a mitigating factor.

Counsels' performance with respect to Petitioner's substance abuse problems was equally satisfactory. It was clear that Petitioner's primary mental health issue was his addiction to drugs and alcohol. Counsel therefore retained Hickey, an expert in the field of addiction. Hickey reviewed the relevant materials, interviewed Petitioner, and received corroborating information from other sources. At the sentencing hearing, he presented the trial court with a thorough and sympathetic assessment of the effects of Petitioner's history of drug abuse. Counsel reasonably relied on Hickey's expertise and Petitioner has offered nothing to suggest that a different approach to the subject was warranted or would have been more effective. *See Ceja v. Stewart,* 97 F.3d 1246, 1255 (1996) (IAC claim fails without explanation of what compelling evidence additional investigation would have turned up); *Williams v. Woodford*, 384 F.3d at 611 ("an attorney is entitled to rely on the opinions of

mental health experts in deciding whether to pursue an insanity or diminished capacity defense").  Again, counsels' efforts at sentencing convinced the court that Petitioner's background of substance abuse was a mitigating factor.  Moreover, in addition to his testimony concerning Petitioner's addiction to drugs and alcohol, Hickey was able to describe and explain the psychological effects of Petitioner's abusive childhood.

Nevertheless, Petitioner faults counsel for not explaining that his failure to complete drug rehabilitation was an indication of his immaturity and thus a mitigating circumstance. (Dkt. 106 at 61.)  In fact, counsel elicited testimony from Hickey explaining that drugs controlled Petitioner's life and that, considering the extent of his addiction, his lack of success in rehabilitation was not unexpected.  (RT 8/1/88 at 47-48.)  This approach to the issue was reasonable, particularly given the Arizona Supreme Court's rejection of the argument that failure to complete a drug rehabilitation program should have been considered in mitigation: "The evidence suggests that defendant turned down the opportunity to enter such a program on three separate occasions; therefore, the trial judge correctly rejected this claim of mitigation." *West*, 176 Ariz. at 450, 862 P.2d at 210.  Additional attempts to explain or justify Petitioner's failure to complete treatment would have had no mitigating value.

Petitioner also contends that counsel were put on notice that Petitioner suffered from cognitive impairment due to head injuries and that they performed ineffectively in failing to present such evidence. (Dkt. 106 at 59-60.)  The only information in the record suggesting that Petitioner had experienced head trauma leading to impairment is contained in a December 1987 neurological evaluation prepared by Dr. Allender. (Dkt. 28, Ex. 19.)  In summarizing his findings, Dr. Allender wrote:

> [Petitioner] reports a variety of head injuries from accidents and fights as well as a history of drug and alcohol abuse all of which raised the question of any cognitive impairment.  Current results suggest generally average to low average performance in intellectual memory, language and perceptual functioning.  The results are difficult to interpret in terms of organic impairment due to head injury and appear more consistent with an individual of low educational status who may have some evidence of a learning disability. The one deficit which he demonstrates is some right handed motor slowing. While organic impairment cannot be ruled out as a cause of this deficit, it is not substantial enough to interpret as evidence of organic impairment without corroborative evidence on other tasks.

1    (*Id.*)

2         Despite the equivocal nature of this report, counsel did not ignore the possibility that

3    Petitioner was cognitively impaired.  In their motion to continue the sentencing hearing,

4    counsel stated they needed additional time to investigate whether Petitioner suffered from

5    organic brain damage.  (ROA 456.)  They also elicited testimony from Hickey explaining

6    that the neurological effects of addiction are similar to brain damage. (RT 8/1/88 at 15.)  The

7    fact that counsel did not offer evidence of impairment due to head trauma is not sufficient

8    to establish that their performance at sentencing was deficient or prejudicial.  Either counsel

9    found no such evidence or they chose not to use it.  In either case, the presumption remains,

10   unrebutted by Petitioner, that their performance was reasonable. *Strickland*, 466 U.S. at 689;

11   *see also Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) (explaining that counsel

12   is not deficient for failing to find mitigating evidence if, after a reasonable investigation,

13   nothing has put the counsel on notice of the existence of that evidence and that "a lawyer

14   may make reasonable decisions that render particular investigations unnecessary").

15        Courts have recognized that mental health evidence is a "double-edged sword,"

16   particularly when counsel focus their mitigation argument on the defendant's character or

17   amenability to rehabilitation.  *Truesdale v. Moore*, 142 F.3d 749, 754 (4th Cir. 1998)

18   (counsel exercised reasonable strategic judgment by "steer[ing] away from" evidence of

19   organic brain dysfunction, "calculating that it would not help portray [Petitioner] as normal

20   and capable of rehabilitation"); *Cannon v. Gibson,* 259 F.3d 1253, 1277-78 (10th Cir. 2001)

21   (omitted mitigation information of "serious brain damage" and lack of impulse control would

22   have displaced mitigation information portraying the petitioner as a "kind, compliant, and

23   responsible individual whose involvement in the murder was an aberration"). Counsels'

24   strategy at sentencing was to focus on the damaging effects of Petitioner's dysfunctional

25   childhood and long-term addiction to drugs and alcohol and to emphasize that Petitioner was

26   basically a good person who with the proper help could be rehabilitated.  This was a sound

27   strategy, and Petitioner has offered no support for the proposition that emphasizing evidence

28

of cognitive impairment due to head injuries – if such evidence existed – would probably have led to a different sentence.  *See Strickland,* 466 U.S. at 689 (cautioning against "second-guessing" strategies that have proved unsuccessful).

Counsel conducted an extensive investigation of potential mitigating circumstances and presented substantial evidence at sentencing in an attempt both to explain Petitioner's conduct and to humanize him to the court.  *See Allen v. Woodford*, 395 F.3d 979, 1006-07 (9th Cir. 2005).  Given these circumstances, "[t]his case is therefore not even remotely similar to those where counsel completely failed to investigate or present mitigating evidence." *Babbit*, 151 F.3d at 1176.  Thus, Petitioner has not shown that counsel performed ineffectively in their development and presentation of mitigating evidence.

Conclusion:

Based upon its independent review of the record, the Court concludes that counsels' performance at both the guilt and sentencing stages of trial was neither deficient nor prejudicial.  Therefore, the PCR court's denial of Petitioner's IAC claims did not constitute an objectively unreasonable application of *Strickland* and Petitioner is not entitled to relief on Claim A

**Claim B:  Ineffective Assistance of Appellate Counsel**

Petitioner alleges that appellate counsel provided ineffective assistance by filing a "choppy and incomplete brief."  (Dkt. 106 at 65-69.)  According to Petitioner, appellate counsel, in composing the brief, did not display an "ethos" of "appellate charisma" and this prejudiced Petitioner before the justices of the Arizona Supreme Court.  (*Id.* at 68.)

Appellate counsel sought permission from the Arizona Supreme Court to file a 286-page opening appeal brief.  *West,* 176 Ariz. at 439, 862 P.2d at 199.  The court allowed counsel to file an oversized brief of 150 pages with a sixty-five page reply.[11]  *Id.*  In its written opinion, the court held that limiting the size of the brief did not violate due process.

---

[11]     By rule, opening briefs were limited to eighty pages and reply briefs to forty pages.  *West,* 176 Ariz. at 439, 862 P.2d at 199.

*Id.* The court characterized the brief as "excessively long" and criticized counsel's "kitchen sink approach" to appellate advocacy. *Id.*

The Fourteenth Amendment guarantees a criminal defendant the right to effective assistance of counsel on his first appeal as of right. *Evitts v. Lucey*, 469 U.S. 387, 391-405 (1985). A claim of ineffective assistance of appellate counsel is reviewed according to the standard set out in *Strickland. See Miller v. Keeney*, 882 F.2d 1428, 1433-34 (9th Cir. 1989). Petitioner must show that counsel's appellate advocacy fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's deficient performance, Petitioner would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *see also Miller*, 882 F.2d at 1434 n.9 (citing *Strickland*, 466 U.S. at 688, 694).

While the Arizona Supreme Court expressed frustration with the encyclopedic nature of appellate counsel's brief, and may even have agreed that it lacked charisma, the standard for effective performance under *Strickland* is not perfect advocacy. *See Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000). Instead, counsel's performance "must be only objectively reasonable, not flawless or to the highest degree of skill." *Id.* Ultimately, however, the Court finds it unnecessary to determine whether appellate counsel's performance was objectively reasonable because Petitioner has clearly failed to satisfy *Strickland*'s second prong.

Petitioner has not attempted to demonstrate that he would have prevailed on appeal with the filing of a more streamlined appellate brief. Instead, he has simply offered a generalized and highly theoretical description of the deficiencies in appellate counsel's brief and concluded that they entitle him to relief. These conclusory allegations are insufficient to establish prejudice. *See Russell v. Lynaugh*, 892 F.2d 1205, 1213 (5th Cir. 1989) (general complaints about the quality of the appellate brief are not sufficient to establish prejudice). Petitioner has provided no basis for his contention that a more condensed or coherent presentation of the same issues was reasonably likely to have led to a reversal. Therefore, Petitioner is not entitled to relief on Claim B.

**Claim E-1:  Trial Court's Bias**

Petitioner alleges that the trial judge displayed inattentiveness and impatience during the presentation of the defense case and that these expressions were manifestations of the court's bias against Petitioner. (Dkt. 106 at 69-73.)  Specifically, Petitioner contends that the judge gave his full attention to the prosecutor's opening statement but looked at a clock on the wall during defense counsel's presentation. (*Id.* at 71-72.)  Petitioner also asserts that the judge appeared impatient during the examination of defense witnesses, "laughingly" referred to the proposed suicide defense as "bizarre," and called  a mitigation witness "a liar." (*Id.* at 72.)

Background:

The source for one of the incidents of alleged bias is a comment by defense counsel to the court on the fifth day of trial.  Mr. Dawley informed the judge that in his "subjective impression" the judge had appeared "not interested" in the defense's opening statement and was "very impatient" with Ms. Fiorillo during her examination of witnesses.  (RT 3/16/88 at 3-4.)  The judge responded:  "If I did it, Frank, I didn't realize I was doing it.  You are right in one respect, I was getting a little impatient with some of it, it was a little redundant in my opinion, the cross examination." (*Id.* at 4.)

Another instance occurred in response to Luann St. Aubin's testimony at the sentencing hearing that Petitioner's lawyer in his manslaughter trial had failed to ask her if the victim "went for his gun." (RT 8/1/88 at 61.)  The judge concluded that she was "lying," because it was inconceivable to him that a defense attorney would fail to ask that question unless "he didn't get the right answer" when he interviewed her before trial.  (*Id.* at 63.)

Finally, Petitioner asserts that the judge derided the defense's proposed "suicide defense" as "bizarre."  In a hearing on pending motions, it was *defense* counsel who referred to the suicide theory as "so weird and so bizarre."  (RT 3/9/88 at 69.)  The trial judge expressed skepticism as to the relevance of the defense and acknowledged that he "got a real good chuckle out of" the motion.  (*Id.* at 83.)  He then stated: "I don't want to deprive you of a defense; on the other hand I don't want to sit here and let something come in that's very

interesting but may have absolutely no relevance to this case." (*Id.*)

On direct appeal, the Arizona Supreme Court rejected Petitioner's claim of judicial bias:

> Defendant asserts that the judge's behavior during trial prejudiced him. Late in the case, defendant claimed that the trial judge had looked away from the jury during defendant's opening statement. A second claim is that the trial court was impatient with defense counsel during the defense case. Defendant's claims are based on counsel's subjective impressions.
>
> Both parties are entitled to a trial presided over by a fair and impartial judge. *State v. Carver,* 160 Ariz. 167, 172, 771 P.2d 1382, 1387 (1989). The trial court is presumed to be impartial, and the party alleging bias must prove bias by a preponderance of the evidence. *Id.*
>
> Defendant has placed no evidence in the record of bias by the trial judge. All that is referred to are unsupported assertions by defense counsel during trial, at least one of them long after the alleged fact. There is no substantiation of the claim of judicial misconduct, nor is there any showing of resulting prejudice.

*West*, 176 Ariz. at 445, 862 P.2d at 205.

<u>Analysis:</u>

A defendant is entitled to a fair trial, free from judicial bias. *In re Murchison*, 349 U.S. 133, 136 (1955). There is a presumption that judges are unbiased, honest, and have integrity. *See Schweiker v. McClure*, 456 U.S. 188, 195 (1982); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). Judicial bias is shown in one of two ways, either by demonstrating the judge's actual bias, which Petitioner does not attempt, or by showing that the judge had an incentive to be biased sufficiently strong to overcome the presumption of judicial integrity (i.e., a substantial likelihood of bias). *Paradis v. Arave*, 20 F.3d 950, 958 (9th Cir. 1994); *Fero v. Kerby*, 39 F.3d 1462, 1478-79 (10th Cir. 1994). The Supreme Court has explained that a showing of bias cannot be based merely upon the tenor of a judge's remarks:

> [J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible . . . . *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display. A judge's ordinary efforts at courtroom administration – even a stern and short-tempered judge's ordinary efforts at courtroom administration – remain immune.

1   *Liteky v. United States*, 510 U.S. 540, 555-56 (1994).

2       Accepting as true Petitioner's characterization of the judge's demeanor, neither it nor

3   the judge's comments suggest a substantial likelihood of bias.  First, the judge's conduct and

4   remarks did not originate from an extra-judicial source, but were responses to incidents that

5   occurred during the proceedings.  "[O]pinions formed by the judge on the basis of facts

6   introduced or events occurring in the course of the current proceedings . . . do not constitute

7   a basis for a bias or partiality motion unless they display a deep-seated favoritism or

8   antagonism that would make fair judgment impossible."  *Id.* at 555; *see United States v.*

9   *Wilkerson*, 208 F.3d 794, 797 (9th Cir. 2000).  Moreover, the judge's demeanor did not

10  reveal favoritism or a meaningful degree of antagonism toward the defense, but instead

11  demonstrated, at most, a mild frustration with one of Petitioner's attorneys.  *Cf. United States*

12  *v. Burt*, 765 F.2d 1364, 1368 (9th Cir. 1985) ("[p]ersonal bias or a prejudiced attitude must

13  be against the party, not against the attorney for the party").  In addition, the judge's

14  comments about the defense theory did not occur in front of the jury, so they could not have

15  affected the verdict.  Finally, when considered in the context of the trial as a whole, the

16  instances of alleged bias were isolated and trivial and had no impact on the fairness of the

17  proceedings.  *See Duckett v. Godinez*, 67 F.3d 734, 741 (9th Cir. 1995) (denying habeas

18  relief on petitioner's complaint that the trial judge lacked impartiality, was hostile and

19  sarcastic, and participated in the questioning of witnesses).

20      The decision of the Arizona Supreme Court rejecting Petitioner's claim of judicial

21  bias was not an unreasonable application of clearly established federal law.  Therefore,

22  Petitioner is not entitled to relief on Claim E-1.

23  **Claim F:  Prosecutorial Misconduct**

24      Petitioner alleges that the prosecutor committed misconduct during his closing

25  argument by (1) commenting on the defense's failure to call a witness, (2) accusing defense

26  counsel of asking improper questions, (3) stating that the defendant would be "tickled pink"

27  to be convicted of only one offense, and (4) improperly shifting the burden to the defendant

28

to prove his innocence.  (Dkt. 106 at 73-81.)

Analysis:

The appropriate standard of habeas review for a claim of prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)) (petitioner not entitled to relief in the absence of a due process violation even if the prosecutor's comments were "undesirable or even universally condemned"). Therefore, in order to succeed on these claims, Petitioner must prove not only that the prosecutor's comments were improper but that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.*; *see Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (relief on such claims is limited to cases in which the petitioner can establish that prosecutorial misconduct resulted in actual prejudice) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)); *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").

In determining if Petitioner's due process rights were violated, the Court "must consider the probable effect of the prosecutor's [comments] on the jury's ability to judge the evidence fairly." *United States v. Young*, 470 U.S. 1, 12 (1985).  To make this assessment, it is necessary to place the prosecutor's remarks in context.  *See Boyde v. California*, 494 U.S. 370, 385 (1990); *United States v. Robinson*, 485 U.S. 25, 33-34 (1988); *Williams v. Borg*, 139 F.3d 737, 745 (9th Cir. 1998).  In *Darden*, for example, the Court assessed the fairness of the petitioner's trial by considering, among other circumstances, whether the prosecutor's comments manipulated or misstated the evidence, whether the trial court gave a curative instruction, and "the weight of the evidence against the petitioner."  477 U.S. at 181-82.  Moreover, the Supreme Court has clearly indicated that the state courts have substantial latitude when considering prosecutorial misconduct claims because "constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise." *Donnelly,* 416 U.S. at 645; *see Slagle v. Bagley*, 457 F.3d at 501, 516 (6th Cir. 2006).

*(1) Comment on failure to call a witness:*  Petitioner alleges that the prosecutor's reference to the defense's failure to call a specific witness led the jury to draw an impermissible inference that the witness's testimony would be adverse to Petitioner.  (Dkt. 106 at 78.)  In her opening statement, defense counsel referred extensively to a witness named Shorty, suggesting that his testimony would undermine the testimony of the State's key witnesses.  (RT 3/10/88 at 49-50.)  Counsel continued, "Now I think the State was originally going to call him, I don't know if they are but he's in town and I will call him if the State doesn't."  (*Id.* at 49.)  Later, the prosecutor moved to strike defense counsel's comments about calling Shorty if the State did not; the court agreed the comments were improper but took no action. (*Id.* at 82–83.)  Neither side called Shorty to testify at trial.

During his closing argument, the prosecutor offered the following comments on defense counsel's opening statement:

> One of the things she mentioned is that we will call this person Shorty, she said the defense would because the State had him under subpoena and they were thinking about calling him, they are not going to so we're going to.

> The defendant doesn't have to do anything in a criminal trial, they don't have to do a thing, they don't have to call a witness, they have subpoena power, she told you she was going to do that, Shorty would deny that certain conversations ever took place between persons.

> Well, they simply didn't produce Shorty and you heard Richard [Wojahn] say Shorty was there, you heard Richard say that he told Shorty about some of the things Mr. West had told him on the way back from the drive to Tucson.

(RT 3/16/88 at 32-34.)

On direct appeal, the Arizona Supreme Court rejected the claim that the prosecutor's remarks constituted misconduct, explaining that, "All the state did was remind the jury, in argument, that defense counsel had not done what she had promised to do.  In the context of this case, the state's comment was not improper."  *West*, 176 Ariz. at 445-46, 862 P.2d at 205-06.

Generally, a prosecutor may fairly comment on the defense's failure to call witnesses or present exculpatory evidence to support its theory.  *See United States v. Mende*, 43 F.3d 1298, 1301 (9th Cir. 1995);*United States v. Cabrera*, 201 F.3d 1243, 1250 (9th Cir. 2000).

A prosecutor may not, however, "call attention to defendant's own failure to testify." *Mende*, 43 F.3d at 1302 (noting the "distinction between a comment on the defense's failure to present exculpatory evidence as opposed to a comment on the defendant's failure to testify"). "The test is whether the comment is manifestly intended to call attention to the defendant's failure to testify, and is . . . of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." *United States v. Castillo,* 866 F.2d 1071, 1083 (9th Cir. 1988) (quotation omitted).

Here, the prosecutor's remarks about the failure to call Shorty as a witness did not bring attention to Petitioner's decision not to testify. Instead, the comments were clearly a response to defense counsel's assertion that Shorty would testify as a key witness whom the State was reluctant to call and whose testimony would undermine the credibility of the State's witnesses. *Cf. United States v. Ziesman,* 409 F.3d 941, 954 (8th Cir. 2005) (prosecutor permitted to argue, in response to counsel's reference to the State's failure to call witnesses, that defendant also has subpoena power and could have produced witnesses; prosecutor also entitled to refer to defendant's failure to produce promised evidence of witness intimidation); *United States v. Hernandez,* 145 F.3d 1433, 1439 (11th Cir. 1998) ("it is not improper for a prosecutor to note that the defendant has the same subpoena powers as the government, particularly when done in response to a defendant's argument about the prosecutor's failure to call a specific witness") (quotation omitted).

Finally, any potential prejudice from the prosecutor's comments was eliminated by the trial court's instructions to the jury that "[w]hat the lawyers say is not evidence" and that "[n]either side is required to call as witnesses all persons who may have been present at any of the events disclosed by the evidence or who may appear to have some knowledge or [sic] these events." (RT 3/16/88 at 111, 112.)

The Arizona Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law.

***(2) Allegations of defense counsel's impropriety:*** Petitioner alleges that the prosecutor's characterization of some of defense counsel's questions as "a defense ploy,"

"improper," and "outrageous" constituted prosecutorial misconduct because the prosecutor never objected to the questions themselves and his comments impugned defense counsel's conduct. (Dkt. 106 at 78–79.)

In his closing argument, the prosecutor reminded the jury that defense counsel had asked witness Richard Wojahn, "isn't it true you smoke Marlboros? Isn't it true you left a Marlboro cigarette in the trailer?" The prosecutor then remarked:

> There's absolutely no evidence at all before you, any suggestion that Richard Wojahn had anything to do with that but it is simply a defense ploy that is supposed to in some way explain how it is they knew what happened because it must have been Richard, I suppose. No evidence at all, I submit that was an improper question, there is nothing to support those outrageous questions she was asking Richard Wojahn.

(RT 3/16/88 at 46-47.)

The Arizona Supreme Court held that the comment "in context, was well within the wide latitude afforded both parties in closing argument." *West*, 176 Ariz. at 446, 862 P.2d at 206. This Court agrees. During closing argument, "prosecutors are allowed reasonably wide latitude and are free to argue reasonable inferences from the evidence." *United States v. McChristian*, 47 F.3d 1499, 1507 (9th Cir. 1995); *see United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997). In addition, the prosecutor's remarks were a "fair response" to defense counsel's arguments about the import of the cigarette. *McChristian*, 47 F.3d at 1506; *see United States v. Sarkisian*, 197 F.3d 966, 989-90 (9th Cir. 1999). In making the challenged comments, the prosecutor was both responding to and drawing reasonable inferences from trial testimony. Therefore, the comments were not improper, and the Arizona Supreme Court's rejection of this claim was not an unreasonable application of clearly-established federal law.

*(3) "Tickled pink" comment:* Petitioner alleges that the prosecutor's statement in rebuttal argument that Petitioner would be "tickled pink" if he were convicted of only one offense was improper because it expressed the prosecutor's personal opinion as to Petitioner's guilt and because it predicted the consequences of the jury's verdict. (Dkt. 106 at 79-80.)

In his closing argument, defense counsel asserted that:

> There is no evidence that Tom West burglarized that house. There is no evidence that he was anywhere near that house when Mr. Bortle was killed. He is innocent. You can acquit him of three charges, you can acquit him of two charges. But acquit him.

(RT 3/16/88 at 91.)

In his rebuttal argument the prosecutor responded:

> And Ms. Fiorillo's last comment gives you some insight into the defense position. Acquit him of one, acquit him of two but acquit him. If you convict him of one he will be tickled pink, that is not holding him accountable for what he did. When you consider the evidence and testimony, return verdicts of guilty on all three counts.

(*Id.* at 109-10.)

The Arizona Supreme Court rejected this claim of prosecutorial misconduct, again concluding that, "[i]n the context of this case, the prosecutor's statement was within the latitude afforded attorneys in final argument," and that "nothing approaching fundamental error occurred." *West*, 176 Ariz. at 446, 862 P.2d at 206. This decision was not an unreasonable application of clearly-established federal law. In *Donnelly*, for example, the prosecutor remarked, in reference to the defendant and his counsel, "I quite frankly think that they hope that you find him guilty of something a little less than first-degree murder." 416 U.S. at 641. In analyzing the petitioner's claim of prosecutorial misconduct, the Court explained that the comment did not implicate a specific constitutional right, such as the right against self-incrimination. *Id.* at 643. Instead, the claim was "only that a prosecutor's remark about respondent's expectations at trial" amounted to a denial of due process. *Id.* The Court concluded that an "examination of the entire proceedings" did not support the claim of a due process violation. *Id.*

The same analysis applies to Petitioner's claim. The prosecutor's remarks did not implicate a specific right; they were not made in bad faith and did not misstate the evidence. Rather, the comments were an invited response to defense counsel's closing argument. In addition, the trial court's final instructions reminded the jury that its decision had to be based on the evidence alone and that the arguments of counsel were not evidence. (RT 3/17/88 at

1    111.) Finally, the evidence of Petitioner's guilt was strong and it was highly improbable that

2    the jury's verdict was affected by the prosecutor's comments.

3        *(4) Burden shifting:*  Petitioner contends that the prosecutor improperly shifted the

4    burden to the defense when he made the following statement in his closing argument (Dkt.

5    106 at 80-81):  "But defense has to consider what to say, knowing that there is a killing,

6    knowing that three witnesses are going to come into Court and say what the defendant said,

7    talk about what he did to Mr. Bortle, what's the explanation?"  (RT 3/16/88 at 46-47.)

8        The Arizona Supreme Court rejected this claim on direct appeal.

9            Both the prosecutor and the judge informed the jury that, in the words
         of the prosecutor, "what the lawyers say is not evidence . . . " and "*[t]he
10        defendant doesn't have to do anything in a criminal trial, they don't have to
         do a thing, they don't have to call a witness* [.] . . ."

11           The cases cited by defendant in support of his argument on this point
12        deal with situations where the trial court instructed the jury in a manner that
         impermissibly shifted the burden of proof to the defendant.  *See, e.g., State v.*
13        *Tittle,* 147 Ariz. 339, 342, 710 P.2d 449, 452 (1985); *State v. Mincey,* 130
         Ariz. 389, 397, 636 P.2d 637, 645 (1981); *cert. denied,* 455 U.S. 1003, 102
14        S.Ct. 1638, 71 L.Ed.2d 871 (1982); *State v. Sterling,* 148 Ariz. 134, 136, 713
         P.2d 335, 337 (App. 1985).  Here, however, defendant claims that arguments
15        *by the prosecutor* shifted the burden of proof to the defendant.

16           The challenged statements could not possibly have affected the jury's
         view of the burden of proof.

17   *West*, 176 Ariz. at 446, 862 P.2d at 206.

18       This decision does not entitle Petitioner to habeas relief.  "Criticism of defense

19   theories and tactics is a proper subject of closing argument." *Sayetsitty*, 107 F.2d at 1409.

20   A prosecutor is permitted to comment on the weaknesses in a defendant's case or counsel's

21   failure to present exculpatory evidence.  Such argument does not improperly shift the burden

22   of proof where, as here, the remarks were not intended to draw attention to the defendant's

23   decision not to testify and the prosecution expressly stated that it bore the burden of proving

24   the defendant guilty beyond a reasonable doubt.  *United States v. Mares,* 940 F.2d 455, 461

25   (9th Cir. 1991).

26       Following the prosecutor's reminder to the jury of the State's burden of proof (RT

27   3/16/88 at 30), the court also instructed the jury that "the defendant is presumed by law to

28
                                        - 46 -

be innocent" and that "the State must prove all its case against that defendant" and "must prove the defendant guilty beyond a reasonable doubt. (*Id.* at 113.)  Therefore, even if the prosecutor's comments had been inappropriate, the court's instructions were "sufficient to cure prejudice resulting from improper prosecutorial argument." *Mares*, 940 F.2d at 461.

Conclusion:

The alleged prosecutorial misconduct did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden,* 477 U.S. at 181. The challenged conduct was not outrageous and was confined to the prosecutor's closing argument.  The case against Petitioner was strong, and the court cured any potential prejudice by providing appropriate jury instructions.  Consequently, the Arizona Supreme Court's resolution of Petitioner's prosecutorial misconduct claims was neither contrary to nor an unreasonable application of clearly established federal law, and Petitioner is not entitled to relief on Claim F.

**Claim G:  "Prior Conviction" Aggravating Factor**

Petitioner alleges that the State failed to prove beyond a reasonable doubt that his prior Illinois manslaughter conviction was for a "crime of violence" under A.R.S. § 13–703(F)(2).  (Dkt. 106 at 81-86.)

As discussed with respect to Claim A-7, at the initial sentencing hearing defense counsel stipulated that Petitioner had been convicted of a violent felony that satisfied the (F)(2) factor.  (RT 5/4/88 at 2.)  The State did not provide a certified copy of the prior conviction, instead offering only an FBI "rap sheet" disclosing the conviction. *West*, 176 Ariz. at 447, 862 P.2d at 207.  The Arizona Supreme Court held that the rap sheet would not have been sufficient to establish the offense absent the stipulation. *Id.*  The court then noted, in upholding the trial court's application of the (F)(2) factor, that "[a]n Illinois appellate court opinion issued after the sentencing discloses that the defendant was indeed convicted of voluntary manslaughter, *a crime included under § 13-703(F)(2)*." *Id.* (emphasis added).

A state court's errors in applying state law do not give rise to federal habeas corpus relief. *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).  On habeas review of a state

court's finding of an aggravating factor, a federal court is limited to determining "whether the state court's [application of state law] was so arbitrary and capricious as to constitute an independent due process or Eighth Amendment violation." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). In making that determination, the reviewing court must inquire "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found that the factor had been satisfied." *Id*. at 781 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The Arizona Supreme Court concluded that Petitioner's voluntary manslaughter conviction met the definition of a violent felony under § 13-703(F)(2). As the Ninth Circuit recently observed, "If a state law issue must be decided in order to decide a federal habeas claim, the state's construction of its own law is binding on the federal court." *Horton v. Mayle*, 408 F.3d 570, 576 (9th Cir. 2005) (citing *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) ("This Court . . . repeatedly has held that state courts are the expositors of state law, and that we are bound by their constructions except in extreme circumstances not present here") (citations omitted)); *see Hawkins v. Mullin*, 291 F.3d 658, 662-63 (10th Cir. 2002) (habeas court is bound by state court's interpretation of its felony-murder statute).

In determining that Petitioner's voluntary manslaughter conviction satisfied § 13-703(F)(2), the Arizona Supreme Court construed its own law and this Court is bound by that interpretation. In addition, given the definition of voluntary manslaughter set forth in the Illinois statute, this Court agrees with the Arizona Supreme Court's conclusion that Petitioner's prior conviction was for a crime of violence.[12] Petitioner could not have

_____

[12] Petitioner was convicted of voluntary manslaughter under Ill.Rev.Stat.1979, ch. 38, par. 9-2. *People v. West,* 209 Ill.App.3d 1019, 568 N.E.2d 945, 945-46, *aff'd*,145 Ill.2d 517, 584 N.E.2d 124 (1991). Section 9-2 defined the offense as follows:

> (a) A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation . . .
> (b) A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the

committed voluntary manslaughter – i.e., killed Billy Oldhum as a result of provocation or in the unreasonable belief that he was acting in self defense – without the "exertion of any physical force so as to injure or abuse." *Arnett*, 119 Ariz. at 51, 579 P.2d at 555.

Even if the state court's interpretation of the (F)(2) aggravating factor was erroneous, Petitioner would not be entitled to federal habeas relief unless the interpretation was arbitrary and capricious. *Jeffers*, 497 U.S. at 780.  Because a reasonable fact finder could have determined that Petitioner's voluntary manslaughter conviction was for a violent felony under § 13-703(F)(2), the Arizona Supreme Court's decision was neither arbitrary nor capricious. *Id.*; *see Parker v. Norris*, 64 F.3d 1178, 1187 (8th Cir. 1195) (rational factfinder could have determined that the "prior violent felony" aggravating circumstance applied).

Finally, as previously noted, after conducting its independent review of the record the Arizona Supreme Court concluded that the death sentence was appropriate in this case even if the (F)(2) factor was not proven. *West*, 176 Ariz. at 452 n.4, 862 P.2d at 212 n.4.  Thus, an erroneous finding of the aggravating circumstance would not have prejudiced Petitioner. Petitioner is not entitled to relief on Claim G.

## Claim H:  "Heinous, Cruel or Depraved" Aggravating Factor

Petitioner alleges that the trial court erred in finding that the murder was "especially heinous, cruel, or depraved" under A.R.S. § 13-703(F)(6).  (Dkt. 106 at 87-91.)

The trial court found that the murder was committed in an "especially cruel, heinous manner" because the victim "was hogtied, bound and beaten repeatedly" and his death was not imminent but rather he was "left dying and in a position unable to seek assistance." (ME 8/1/88.)  Further, Petitioner "knew or had reason to know that the deceased was dying or had suffered serious physical injuries and did nothing to procure assistance for the victim and in fact bragged about the circumstances of the offense." (*Id.*)

---

circumstances to be such that, if they existed, would justify or exonerate the killing . . . but his belief is unreasonable.

On direct appeal, the Arizona Supreme Court affirmed the trial court's finding that the murder was especially heinous:

> We agree with the trial court's finding that the murder was especially heinous. This aggravating factor focuses on the murderer's state of mind. *Amaya-Ruiz*, 166 Ariz. at 178, 800 P.2d at 1286; *State v. Fulminante*, 161 Ariz. 237, 255, 778 P.2d 602, 620 (1988). In *State v. Gretzler*, 135 Ariz. 42, 52, 659 P.2d 1, 11, *cert. denied*, 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), we set forth several specific factors suggested by earlier cases as appropriate in determining whether heinousness is present. . . . The *Gretzler* factors are (1) whether the murderer relished the murder; (2) whether the murderer inflicted gratuitous violence on the victim beyond that necessary to commit the crime; (3) whether the murderer inflicted needless mutilation on the victim; (4) whether the murder was senseless; and (5) whether the victim was helpless. *Gretzler*, 135 Ariz. at 52, 659 P.2d at 11.

> Four of the five *Gretzler* factors are present here. Defendant relished the murder, he inflicted gratuitous violence beyond that necessary to commit the crime, the victim was helpless, and the murder was senseless. When defendant returned to Phoenix, he told people that he "beat the fuck out of some old man" and bragged about cuts and bruises on his hand coming from beating up "the old man he ripped off." This shows that defendant relished his crime. Certainly, tying the victim up and pummeling his face until many bones were broken and the victim's hard palate detached, was gratuitous violence far beyond anything necessary to commit burglary. Just as certainly, the victim was helpless. Finally, the murder was senseless. A murder is senseless if it was unnecessary to achieve the defendant's goal. *State v. Comer*, 165 Ariz. 413, 429, 799 P.2d 333, 349 (1990), *cert. denied*, 499 U.S. 943, 111 S.Ct. 1404, 113 L.Ed.2d 460 (1991). Defendant did nothing to render aid after the crime, even when urged to.

> The trial judge correctly found the murder to be especially heinous. Because the words in the statute "especially cruel, heinous, *or* depraved," are stated in the disjunctive, a finding of any one of the three factors will suffice for finding that this aggravating factor exists. *See, e.g., State v. Walton*, 159 Ariz. 571, 587, 769 P.2d 1017, 1033 (1989), *aff'd*, *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). We, therefore, do not separately analyze defendant's attack on the trial court's finding that the murder was also especially cruel.

*West*, 176 Ariz. at 448, 862 P.2d at 208.

Analysis:

In *Walton*, the United States Supreme Court found Arizona's especially heinous, cruel or depraved aggravating circumstance to be facially vague, but held that Arizona courts had sufficiently narrowed their application of the circumstance so as to constitutionally channel a sentencer's discretion. 497 U.S. at 654; *see also Jeffers*, 497 U.S. at 777-81. Therefore, this Court's review of the state courts' application of the (F)(6) circumstance to the facts is

- 50 -

limited to determining whether the state court's finding was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation. *See Jeffers*, 497 U.S. at 780.

Petitioner disputes the factual bases of the Arizona Supreme Court's findings in support of the heinousness prong – i.e., that he relished the murder and inflicted gratuitous violence, and that the victim was helpless and the murder senseless. *West*, 176 Ariz. at 448, 862 P.2d at 208. These findings are clearly supported by the record, including the testimony of Richard Wojahn and the Millers, to whom Petitioner boasted of the attack, and the results of the autopsy, which detailed the severity of the beating.[13] Based upon this evidence, a rational factfinder could have found, as the trial court and Arizona Supreme Court determined, that the murder was especially heinous. As stated by the Arizona Supreme Court, the (F)(6) factor is satisfied if the murder was especially cruel, heinous, *or* depraved. *Id.*; *see State v. Smith*, 193 Ariz. 452, 461, 974 P.2d 431, 440 (1999). Accordingly, Petitioner is not entitled to habeas relief on Claim H.

**Claim I: "Pecuniary Gain" Aggravating Factor**

Petitioner challenges the constitutionality of A.R.S. §13-703(F)(5), which provides that it is an aggravating factor when "[t]he defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value," arguing that the section is overbroad, subjective, and arbitrarily applied. (Dkt. 106 at 92-94.) Petitioner also contends that in his case the factor was supported only by weak evidence. (*Id.*)

On direct appeal, the Arizona Supreme Court considered Petitioner's attack on both the trial court's application of the pecuniary gain factor and the factor's constitutionality. *West*, 176 Ariz. at 448-49, 862 P.2d at 208-09. The court found sufficient evidence to show that Petitioner was motivated by a desire to steal Mr. Bortle's property. *Id.* at 448, 862 P.2d at 208. The court further held that the pecuniary gain factor does not violate the Eighth

---

[13]     Because the heinousness factor focuses on the state of mind of the perpetrator, *State v. Fulminante,* 161 Ariz. 237, 255, 778 P.2d 602, 620 (1988), Petitioner's speculation about whether the victim was conscious while bleeding to death is not relevant.

Amendment. *Id.* at 448-49, 862 P.2d at 208-09.  In doing so, the court rejected the argument

that (F)(5) repeats an element of the crime of burglary and therefore insufficiently narrows

the class of death eligible defendants in felony murder cases involving burglaries:

> Dealing with a similar argument in the robbery context, we have held that the facts necessary to prove pecuniary gain are not the same as those necessary to prove robbery. *State v. Carriger,* 143 Ariz. 142, 161, 692 P.2d 991, 1010 (1984), *cert. denied,* 471 U.S. 1111, 105 S.Ct. 2347, 85 L.Ed.2d 864 (1985).  In *Carriger,* we stated that "[p]roving a taking in a robbery does not *necessarily* prove the motivation for a murder, and the state cannot be said to be using one fact to prove two different items." *Id.* (Emphasis added.)  This distinction is equally true for burglary.  The defendant need not intend to kill the victim or even to take his property to be guilty of burglary.  Additionally, a felony murder committed in the course of a burglary does not necessarily result in a finding of pecuniary gain, because burglary may be based on the defendant's intent to commit any felony, not just theft. *See* A.R.S. § 13-1506; *State v. Miller,* 108 Ariz. 441, 445, 501 P.2d 383, 387 (1972).  Proving a burglary, therefore, does not necessarily prove pecuniary motivation for the murder.
>
> Federal cases hold that Arizona's capital sentencing scheme, as construed by this court, does narrow the class of death eligible defendants sufficiently to comply with the Eighth Amendment.  A capital sentencing scheme is constitutional if it "'genuinely narrow[s] the class of persons eligible for the death penalty and . . . reasonably justif[ies] the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Lowenfield v. Phelps,* 484 U.S. 231, 244, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988) (quoting *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983)).
>
> Defendant's argument that we must narrow the class of first degree murderers for pecuniary gain into death eligible and non-death eligible cuts too narrowly.  What is required is that the class of murderers in general be narrowed into death eligible and non-death eligible.  Arizona does this first at the guilt phase, by making only those guilty of first degree murder potentially death eligible.  A.R.S. § 13-703(A).  Further, only certain first degree murderers are death eligible-those who commit a first degree murder with one or more aggravating circumstances present. A.R.S. § 13-703(E). That all first degree murders committed for pecuniary gain are death eligible does not render Arizona's capital sentencing scheme unconstitutional. *See Lowenfield,* 484 U.S. at 241-46, 108 S.Ct. at 553-55 (upholding Louisiana's capital sentencing scheme where only first degree murderers were death eligible, and four of the five types of first degree murder led automatically to a death qualifying aggravating circumstance that was identical to an element of the crime).  We therefore reject defendant's argument and conclude that Arizona's aggravating factor of pecuniary gain is constitutional.

*West*, 176 Ariz. at 448-49, 862 P.2d at 208-09.

<u>Analysis:</u>

The decision of the Arizona Supreme Court does not entitle Petitioner to habeas relief.

- 52 -

First, in light of the facts contained in the trial record and outlined by the Arizona Supreme Court, *id.* at 448, 862 P.2d at 208, a reasonable factfinder could have determined that pecuniary gain was a motivating factor in Petitioner's murder of Mr. Bortle. *See Williams v. Stewart*, 441 F.3d 1030, 1060 (9th Cir. 2006) (pecuniary gain factor established where victim was killed because he discovered a burglary in progress).

Next, the Ninth Circuit, interpreting clearly established federal law, has expressly rejected the argument that § 13-703(F)(5) is unconstitutionally vague and fails to genuinely narrow the class of death-eligible defendants. *Id.* at 1059 (citing *Zant v. Stephens*, 462 U.S. 863 (1993)); *see also Poland v. Stewart*, 117 F.3d 1094, 1098-1100 (9th Cir. 1997); *Woratzeck v. Stewart*, 97 F.3d 329, 334-35 (9th Cir. 1996). As the *Woratzeck* court explained, the pecuniary gain factor is constitutionally permissible because it "is not automatically applicable to someone convicted of robbery felony-murder"; the factor therefore "serves to narrow the class of death-eligible persons sufficiently." 97 F.3d at 334.

For analytical support of his argument that the pecuniary gain factor is overbroad and applied arbitrarily, Petitioner relies on the *dissenting* opinion of then-Chief Justice Zlaket in *State v. Greene*, 192 Ariz. 431, 967 P.2d 106 (1998).[14] Chief Justice Zlaket agreed that the pecuniary gain factor had been proven in *Greene* but disagreed with the majority's weighing of the aggravating and mitigating factors and felt that, given the particular circumstances of the case, the death sentence was not warranted. *Id.* at 444, 967 P.2d 120. Those circumstances included, most significantly, the fact that pecuniary gain was the only aggravating factor shown. *Id.* Chief Justice Zlaket also opined that the factor was "relatively weak," given the lack of evidence of "substantial planning" prior to the offense, and that there was strong mitigating evidence supporting a life sentence, including the positive aspects of the defendant's background and character. *Id.* at 445-48, 967 P.2d at 120-23. The factors cited in the dissenting opinion are not present in Petitioner's case. Prior to killing Mr. Bortle,

---

[14]    Justice Zlaket was a member of the Arizona Supreme Court when it affirmed Petitioner's conviction and death sentence.

Petitioner had compiled a significant criminal record, including a conviction for manslaughter.  Having visited Mr. Bortle previously and observed his large collection of electronic goods, Petitioner returned to the residence, hog-tied Mr. Bortle and beat him savagely, left him to bleed to death while removing his property and taking his vehicle, and later boasted of the incident to his friends. Given these circumstances, the analytical framework suggested by Chief Justice Zlaket, even had it been adopted by the majority in *Greene*, would not render Petitioner's death sentence violative of the Eighth Amendment.

For the reasons set forth above, the findings of the Arizona Supreme Court as to A.R.S. § 13-703(F)(5) do not constitute an unreasonable application of clearly established federal law.  Petitioner is not entitled to habeas relief on Claim I.

**Claim O-2:  Execution by Lethal Injection**

Petitioner alleges that death by lethal injection violates the Eighth Amendment.  (Dkt. 106 at 95-99.)  The Arizona Supreme Court's denial of this claim, *West*, 176 Ariz. at 455, 862 P.2d at 215, is neither contrary to nor an unreasonable application of clearly established federal law.  The Supreme Court has never held that execution by lethal injection constitutes cruel and unusual punishment, *see, e.g.*, *Stewart v. LaGrand*, 526 U.S. 115, 119 (1999), and the Ninth Circuit has rejected the argument, *Poland v. Stewart*, 117 F.3d 1094, 1105 (9th Cir. 1997).  Therefore, Petitioner is not entitled to relief on Claim O-2.  *See Musladin,* 127 S. Ct. at 654 (denying habeas relief in absence of clearly established federal law); *Williams*, 529 U.S. at 381 (noting that habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner).

## EVIDENTIARY DEVELOPMENT

Petitioner requests an evidentiary hearing and other forms of evidentiary development.  (*See* Dkt. 106 at 21-32, 100-02.)  For the reasons set forth below, these requests are denied.

Legal Principles

In evaluating Petitioner's requests, the Court applies the relevant provisions of 28 U.S.C. § 2254(e)(2):

If the applicant has failed to develop the factual basis of a claim in State court

proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –

(A) the claim relies on –

> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Section 2254(e)(2) similarly limits a petitioner's ability to present new evidence through a motion to expand the record pursuant to Rule 7 of the Rules Governing Section 2254 Cases.[15] *See Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005) (holding that the conditions of § 2254(e)(2) generally apply to petitioners seeking relief based on new evidence, even when they do not seek an evidentiary hearing) (citing *Holland v. Jackson*, 542 U.S. 649, 652-53 (2004) (per curiam)).

The Supreme Court has interpreted subsection (e)(2) as precluding an evidentiary hearing in federal court if the failure to develop a claim's factual basis is due to a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). A hearing is not barred, however, when a petitioner diligently attempts to develop the factual basis of a claim in state court and is "thwarted, for example, by the conduct of another or by happenstance was denied the opportunity to do so." *Id.*; *see Baja v. Ducharme*, 187 F.3d 1075, 1078-79 (9th Cir. 1999) (allowing hearing when state court denied opportunity to develop factual basis of claim).

The diligence assessment is an objective one, requiring a determination of whether

---

[15]     Rule 7 authorizes a federal habeas court to expand the record to include additional material relevant to the determination of the merits of a petitioner's claims. "The materials that may be required include letters predating the filing of the petition, documents, exhibits, and answers under oath, to written interrogatories propounded by the judge. Affidavits may also be submitted and considered as part of the record." Rule 7(b), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

a petitioner "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Williams*, 529 U.S. at 435. For example, when there is information in the record that would alert a reasonable attorney to the existence and importance of certain evidence, the attorney fails to develop the factual record if he does not make reasonable efforts to sufficiently investigate and present the evidence to the state court. *See id*. at 438-39, 442; *Alley v. Bell*, 307 F.3d 380, 390-91 (6th Cir. 2002). Absent unusual circumstances, diligence requires that a petitioner "at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Williams*, 529 U.S. at 437; *see Bragg v. Galaza*, 242 F.3d 1082, 1090 (9th Cir.), *amended on denial of reh'g*, 253 F.3d 1150 (9th Cir. 2001). The mere request for an evidentiary hearing, however, may not be sufficient to establish diligence if a reasonable person would have taken additional steps. *See Dowthitt v. Johnson*, 230 F.3d 733, 758 (5th Cir. 2000) (counsel failed to present affidavits of family members that were easily obtained without court order and with minimal expense); *Koste v. Dormire*, 345 F.3d 974, 985-86 (8th Cir. 2003); *McNair v. Campbell*, 416 F.3d 1291, 1299-1300 (11th Cir. 2005).

Pursuant to *Townsend v. Sain*, 372 U.S. 293, 312-13 (1963), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *and limited by* § 2254 (e)(2), a federal district court must hold an evidentiary hearing in a § 2254 case when: (1) the facts are in dispute; (2) the petitioner "alleges facts which, if proved, would entitle him to relief;" and (3) the state court has not "reliably found the relevant facts" after a "full and fair evidentiary hearing," at trial or in a collateral proceeding. *See also Hill v. Lockhart*, 474 U.S. 52, 60 (1985) (upholding the denial of a hearing when petitioner's allegations were insufficient to satisfy the governing legal standard); *Bashor v. Risley*, 730 F.2d 1228, 1233-34 (9th Cir. 1984) (hearing not required when claim must be resolved on state court record or claim is based on non-specific conclusory allegations); *see also Landrigan*, 127 S. Ct. at 1940 ("Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate.").

Analysis:

*Claim A.*  To support his claims of ineffective assistance of trial counsel, Petitioner seeks to "now do what trial counsel should have done."  (Dkt. 106 at 24.)  This includes locating, interviewing, and cross-examining all of the State's witnesses; examining all of the physical evidence; re-investigating facts surrounding the 1981 manslaughter; and conducting a complete mitigation investigation, which "involves recreating . . . [Petitioner's] childhood, school performance, and work history, and then providing all of this evidence to experts." (*Id.* at 24-27.)

During the PCR proceedings Petitioner requested, but did not receive, an evidentiary hearing on his IAC claims.  (*See* ROA-PCR 92; ME 8/8/96 at 3.)  He also sought expert funding and attached supporting affidavits to his requests.  (*See* ROA-PCR 92.)  Arguably, such efforts constituted a diligent attempt to develop the factual basis for Petitioner's IAC claims.  However, assuming Petitioner diligently sought to develop the claims in state court, an evidentiary hearing is unnecessary because he has not alleged the existence of disputed facts which, if true, would entitle him to relief.  *Townsend*, 372 U.S. at 312-13.  Instead, he has offered only speculation as to what his proposed wholesale reinvestigation of the case might reveal.  *See United States v. Zuno-Acre*, 209 F.3d 1095, 1103 (9th Cir. 2000) (speculation is not a basis for an evidentiary hearing); *Daniels v. United States*, 54 F.3d 290, 293 (7th Cir. 1995) ("A hearing is not necessary if the petitioner makes conclusory or speculative allegations rather than specific factual allegations."); *Bashor*, 730 F.3d at 1234-35.

Petitioner contends that counsel performed deficiently at the guilt stage of trial by offering an alibi defense and failing to undertake additional investigation.  The merits of that contention can be resolved without further evidentiary development.  The record adequately details counsels' performance, including their effort to develop and present an alibi defense and to investigate other defense theories.  Therefore, because his IAC claims can be "resolved by reference to the state court record," Petitioner is not entitled to an evidentiary hearing.  *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998); *see Griffey v. Lindsey*, 345

F.3d 1058, 1067 (9th Cir. 2003) (hearing is not warranted if petitioner's claims can "be resolved by reference to the state court record and the documentary evidence); *Cardwell v. Greene*, 152 F.3d 331, 338-39 (4th Cir. 1998) (denying an evidentiary hearing on IAC claims where the petitioner "failed to forecast any evidence beyond that already contained in the record, or otherwise explain how his claim would be advanced by an evidentiary hearing.").

In *Totten v, Merkle*, the Ninth Circuit held that the petitioner was not entitled to an evidentiary hearing to determine whether trial counsel's decision not to pursue a mental impairment defense was deficient because the petitioner had failed to show that a hearing would shed new light on the question of prejudice. *Id.* at 1176-77. Similarly, as discussed above, Petitioner has not shown that an evidentiary hearing would produce any new information to support his conjecture that a different guilt-stage defense was viable, that counsels' failure to pursue an alternative strategy was unreasonable, and that there was a reasonable probability that a different strategy would have produced a different verdict.

The same analysis applies to Petitioner's claims of IAC at sentencing. Counsel argued and presented testimony concerning Petitioner's unfortunate childhood and his drug and alcohol abuse. The record is sufficient to resolve this claim because it clearly shows that counsel presented a strong case in mitigation based on a thorough investigation of Petitioner's background. *See Johnson v. Luebbers*, 288 F.3d 1048, 1058-60 (8th Cir. 2002) (district court did not abuse its discretion in denying petitioner's request for an evidentiary hearing on claim that counsel was ineffective for failing to present mitigating evidence of petitioner's mental health and diminished mental capacity where record already contained facts necessary to resolve claim). In addition, for the reasons set forth in the Court's consideration of the merits of Claim A-8, a review of the entire record indicates that the facts now alleged by Petitioner, even if proved true, would not entitle him to relief on this claim. *See Landrigan*, 127 S. Ct at 1940. Therefore, Petitioner is not entitled to an evidentiary hearing with respect to Claim A.

*Claim B.* Petitioner seeks testimony from a legal expert on appellate advocacy and requests an opportunity "to interview the [Arizona Supreme] Court in an attempt to

determine whether any of the participating justices were influenced consciously or subconsciously by the offending brief." (Dkt. 106 at 64-65.) These requests are denied because Petitioner's claim of ineffective assistance of appellate counsel is properly resolved on the record. *See Gray v. Greer*, 800 F.2d 644, 647 (7th Cir. 1985) ("it is the exceptional case" where a claim of appellate IAC "could not be resolved on the record alone"). Moreover, Petitioner has neither identified any disputed facts nor "allege[d] facts which, if proved, would entitle him to relief." *Townsend*, 372 U.S. at 312-13.

*Claim E-1.* To demonstrate that Judge Meehan (now deceased) "conspired against him," Petitioner seeks "court records of his involvement and self-appointment to cases" and "interviews with defense counsel." (Dkt. 106 at 70.) Petitioner was not diligent in developing the factual basis of this judicial-bias claim in state court; the information he seeks now could have been obtained previously. *See Alley v. Bell*, 307 F.3d at 390-91. Moreover, because the claim is clearly meritless under the AEDPA, Petitioner is not entitled to evidentiary development. *See Getsy v. Mitchell*, 495 F.3d 295, 310-11 (6th Cir. 2007) (en banc) (petitioner not entitled to evidentiary hearing on judicial bias claim where allegations of bias failed to state "sufficient grounds for relief under AEDPA's deferential standard").

*Claim F.* Petitioner wishes to expand the record so that he can present evidence of the prosecutor's "control of the case" and defense attorney Fiorillo's "lack of experience." (Dkt. 106 at 74.) The Court denies these requests. Petitioner's claim of prosecutorial misconduct is properly resolved by reference to the state court record. *See Turner v. Chavez*, 586 F.2d 111, 112-13 (9th Cir. 1978) (stating that habeas review of a prosecutor misconduct claim involves a thorough review of the state court record regarding the allegations); *see also Darden*, 477 U.S. at 181-83 (stating that habeas review of a prosecutorial misconduct claim necessarily includes a careful review of the totality of the state court record to determine whether the alleged misconduct denied petitioner a fair trial). Expansion of the record is not required on an issue resolved by reference to the state court record. *See Totten*, 137 F.3d at 1176.

*Claims G, H, and I.* As previously noted, federal habeas review of Claims G, H, and

I, which challenge the application of aggravating factors, is limited to determining whether the state courts' finding that the factors had been proved was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation. *Jeffers*, 497 U.S. at 780 (1990). These are necessarily record-based claims, for which the admission of additional evidence is unwarranted.

*Claim O-2.* Because there is no Supreme Court precedent holding that lethal injection violates the Constitution, Petitioner cannot gain habeas relief on this claim under the AEDPA. Therefore, he is not entitled to evidentiary development with respect to Claim O-2.[16]

### **CERTIFICATE OF APPEALABILITY**

In the event Petitioner appeals from this Court's judgment, and in the interests of conserving scarce Criminal Justice Act funds that might be consumed drafting an application for a certificate of appealability to this Court, the Court on its own initiative has evaluated the claims within the petition for suitability for the issuance of a certificate of appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a certificate of appealability (COA) or state the reasons why such a certificate should not issue. Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For

---

[16]     In *Hill v. McDonough*, 126 S. Ct. 2096, 2101-02 (2006), the Supreme Court indicated that a challenge to lethal injection could be brought in a 42 U.S.C. § 1983 action.

procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate its resolution of the issues set forth in Claim A-8. The Court therefore grants a certificate of appealability as to that claim. For the reasons stated in this Court's Memorandum of Decision and Order, as well as the Order regarding the procedural status of Petitioner's claims filed on January 18, 2006 (Dkt. 82), the Court declines to issue a certificate of appealability with respect to the remaining claims and procedural issues.

## CONCLUSION

For the reasons set forth above, Petitioner is not entitled to habeas relief. The Court further finds that an evidentiary hearing in this matter is neither warranted nor required.

Accordingly,

**IT IS ORDERED** that Petitioner's Third Amended Petition for Writ of Habeas Corpus (Dkt. 74) is **DENIED**. The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the stay of execution entered by this Court on May 20, 1998 (Dkt. 7), is vacated.

**IT IS FURTHER ORDERED** that the Court grants a Certificate of Appealability as to the following issue: Whether Claim A-8, alleging a violation of Petitioner's right to effective assistance of counsel at the sentencing stage of trial based on counsels' failure to investigate and present mitigation evidence concerning Petitioner's impaired mental health, head injuries, childhood abuse, immaturity, substance abuse, and failure to complete drug rehabilitation fails on the merits.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

//

DATED this 28th day of November, 2007.

David C. Bury
United States District Judge

*copy to Clerk, Arizona Supreme Court by cjs 11/28/07*